STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 06-543


STATE OF LOUISIANA

VERSUS

WADE C. GRIFFIN


**********

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 128628A
HONORABLE MARK A. JEANSONNE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Oswald A. Decuir, Marc T. Amy, and Billy Howard Ezell, Judges.

**AFFIRMED.**


Charles A. Riddle, III
**District Attorney, Twelfth Judicial District Court**
Michael Francis Kelly
**Assistant District Attorney, Twelfth Judicial District Court**
P. O. Box 1200
Marksville, LA 71351
(318) 253-6587
**Counsel for Plaintiff /Appellee:**
**State of Louisiana**

**Michael Anderson Brewer**
**Attorney at Law**
**1330 Jackson Street**
**Alexandria, LA 71301**
**(318) 443-4006**
**Counsel for Defendant/Appellant:**
**Wade C. Griffin**

**Wade C. Griffin**
**Allen Correctional Center**
**3751 Lauderdale Woodyard Road**
**Kinder, LA 70648**

**EZELL, JUDGE.**

On May 26, 2005, the Defendant, Wade C. Griffin, was charged in an indictment with second degree murder, a violation of La.R.S. 14:30.1. The Defendant entered a plea of not guilty on June 2, 2005.

The matter proceeded to trial by jury on October 18, 2005, and on October 19, 2005, the jury returned a verdict of guilty of manslaughter, a violation of La.R.S. 14:31. A motion for new trial was filed on November 10, 2005, and denied on January 30, 2005.

Also, on January 30, 2005, the Defendant was sentenced to serve thirty-five years at hard labor. A motion to reconsider sentence was filed on February 3, 2006. The motion was denied on February 23, 2006.

A notice of appeal and designation of record were filed on February 2, 2006. The Defendant is now before this court asserting three assignments of error. The Defendant contends the jury erred in rejecting the affirmative defense of self-defense and finding him guilty of manslaughter, the sentence imposed was constitutionally excessive, and the prosecution for second degree murder constituted double jeopardy. We find these assignments lack merit.

## FACTS

On March 22, 2005, the Defendant stabbed Marcus Conway, who subsequently died as a result of his injuries.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

1

**ASSIGNMENT OF ERROR NUMBER ONE & *PRO SE* ASSIGNMENT OF ERROR NUMBER ONE**

In his first assignment of error, the Defendant contends the jury erred in rejecting the affirmative defense of self-defense and finding him guilty of manslaughter.

This court discussed the state of the law regarding self-defense in *State v. Alexander*, 04-788, pp. 1-2 (La.App. 3 Cir. 11/17/03), 888 So.2d 401, 402, as follows:

Louisiana Revised Statute[s] 14:20 provides that a homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

When reviewing the sufficiency of the evidence, appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and must determine "whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). When a defendant claims that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that he did *not* act in self-defense. *State v. Brown*, 414 So.2d 726 (La.1982). Defendant argues that the State failed to carry its burden of proof on this issue. Therefore, we must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that he did not act in self-defense. *State v. Matthews*, 464 So.2d 298 (La.1985).

The Defendant has two stepchildren, Jill Washington and Chad Washington. Marcus Conway, the victim, was Jill's longtime boyfriend. The Defendant admitted that he stabbed Marcus on March 22, 2005, and, as a result, Marcus died. Although Marcus was stabbed in the abdomen, an autopsy revealed that he died as a result of an injury to an artery located at the back of the spinal column.

2

At approximately noon on March 22, 2005, the Defendant returned home after being out all night. Jill and Chad testified that at that time the Defendant and his wife, their mother, began to argue. However, the Defendant testified that he and his wife were merely talking. During the course of the argument, the Defendant referenced Jill's relationship with Marcus. Jill testified that the Defendant said Marcus got her on drugs, Marcus used drugs, and Marcus was having sexual relations with other girls. The Defendant testified that during the argument Jill began ranting and raving and his wife told him to be quiet, that he was going to make Jill hemorrhage, as she was seven months pregnant at the time.

Between 3:00 and 3:30 p.m., Jill and Chad brought their mother to work. Jill then went to see Marcus and told him about her argument with the Defendant. Jill and Chad then left to return home and Marcus left right behind them. However, Marcus arrived at the apartment before Jill and Chad.

The Defendant testified that after Jill, Chad, and his wife left, he heard a knock at the door and looked outside to find Marcus standing by his car. Marcus asked the Defendant if there was something the Defendant needed to speak to him about. During that time, Marcus and the Defendant were standing in the parking lot of the apartment building on the left side of Marcus' car near the area by a concrete parking stop. Jill and Chad then pulled up. Jill testified that when she drove up Marcus was standing on the side of the concrete parking stop closest to his car and the Defendant was standing on the other side of the concrete stop. Chad testified that when he and Jill arrived, the Defendant and Marcus were near the apartment window. The Defendant testified that Jill got out of the car and told Marcus, "this m_ _ _ _r f_ _ _ _r here he said you get me high, [he] said you out screwing people and this that and the other." The Defendant testified that Jill then told Marcus the Defendant said

3

Marcus' mother bought his car. In response, Marcus said, "we're going to take this to the next level." Marcus then went to his car and the Defendant testified that at that time he heard the trunk pop and looked to see Marcus at the trunk of the car. The Defendant further testified that Marcus then ran into him and he "went back" and then threw his hands up to block his face and head. The Defendant then testified as follows:

> Well when I threw my hands up and he caught me . . . he caught my arms a couple of times and we was going back, we was . . . I mean I was we was coming backward. And he was coming at me and like I said I blocked my . . . I threw my hands up because I didn't know what he had, a knife, a gun or whatever . . . .

However, the Defendant was questioned regarding whether, on the date of the offense, he told police that he threw up his arms. The Defendant also testified that Marcus was coming at him swinging.

The following exchange occurred regarding when the Defendant pulled out the knife he used to stab Marcus:

Q.     All right. You can sit back. So when did you pull the knife out? At what point in this did you pull the knife out?

A.     At what point did I pull the knife out. Well I would imagine it was after I fell . . . we went back and he caught me a couple of times across the . . . well my arm, you know I threw my hands up like I said. So I would imagine it wasn't much in between that and . . .

Q.     . . . Was he punching you?

A.     . . . So it had to be out there.

Q.     He was punching you?

A.     Well punching . . .

Q.     What did you catch with your arms, Mr. Griffin?

A.     I reckon it was his hands or his arms. Something to that degree. I almost . . .

Q.     There was nothing in those hands was it?

4

A.     Oh I don't . . . not that I know of man.  I was just shook.

Q.     Go ahead I'm sorry, you ahead.  I don't mean to cut you off.

A.     Okay.  I mean like I said he was so close I didn't see his hands and I don't actually think he could really right now sitting back in a peaceful sane mind right here under no pressure, I don't see really how he could catch totally with his hands.  He was too close for me to see anything, I mean he was too close really just catch me with his hand.  I thoroughly believe he just coming straight at me all over me.

Q.     When did you pull out the knife?

A.     It had to be after that, because the incident wasn't much more after that.  I mean after that.  After he caught me and we was heading backwards.

The Defendant testified that when he stabbed Marcus, Marcus was coming straight at him.  The Defendant further testified that when he pulled out the knife he and Marcus were in the area of the concrete parking stop in the "front vicinity of the car."  He then indicated they were by the car door at that time.

The Defendant testified that when he realized he had stabbed Marcus, he ran behind Marcus to check on him.  The Defendant testified that when he went to Marcus, he picked up Marcus' head and put his hand over Marcus' wound.  He also told Marcus "don't die."

Jill testified that when she and Chad drove up, Marcus was telling the Defendant that the Defendant should not be saying things about him in front of Jill's mother.  Jill further testified that Marcus then walked by his car door, which was open, and the Defendant came up to Marcus, who had his hand on the car door, and pointed his hand in Marcus' face.  Marcus then pushed the Defendant back and the Defendant went back toward Marcus and Marcus said, "man you stabbed me."

Jill testified that after Marcus was stabbed he ran across the street.  Jill further testified that the Defendant ran after Marcus stating, "I told ya'll."  The Defendant

5

then picked up Marcus' head and said "don't die on me n_ _ _ _r, n_ _ _ _r don't die."  At that time, the Defendant was crying.

Jill testified that she never heard Marcus say "we're going to take this to the next level or we're going to handle this right now."  She did not see Marcus pop the trunk of his car.  Additionally, she did not see the knife used to stab Marcus and did not see Marcus with a weapon.

The following exchange occurred on cross-examination regarding whether Jill was aware that Marcus popped the trunk of his car:

> Q.    Now I'm going to direct your attention to some statements that you may have made to Officer Augustine at the time.  Do you recall telling her that as Cory and Marcus were arguing that they were getting . . . Marcus was getting closer and closer to him?[1]
>
> A.    Um hum.
>
> Q.    Do you recall telling Officer Augustine that?
>
> A.    No, sir.
>
> Q.    Are you saying that you did not tell her that or you don't remember it?
>
> A.    I don't remember saying it.
>
> Q.    Do you recall telling her that before he was stabbed Marcus walked up to his vehicle and popped his trunk?
>
> A.    I don't remember saying that because I didn't even know he popped the trunk, they told me the trunk was popped.
>
> Q.    Okay, I'm just asking if you remember making these statements.
>
> A.    O.K.
>
> Q.    Do you recall telling her that Cory felt like Marcus was going to get a gun from the trunk therefore he felt threatened?
>
> A.    When she told me the trunk was popped, I say I guess that's why Cory stabbed him because he must have thought Marcus was going get a gun or something out of his trunk.

---

[1]Several witnesses in the record refer to the Defendant as Cory.

6

Chad testified that upon arriving home, Jill got out of the car and screamed, "[t]hat b_ _ ch and that m_ _ _ _r f_ _ _ _r he said it and all that" at Marcus. Marcus then told the Defendant "keep my name out of your . . . f_ _ _ _g mouth." Chad also testified that the Defendant was not angry or physically aggressive toward Marcus at that time. Chad heard Marcus say, as Marcus walked toward his car, "we can handle this right here if you want to." Chad later testified that Marcus said, "Right now if you want to." Marcus then sat in his car and Chad entered the apartment.

Chad testified that he was in the apartment for five minutes then went outside and saw Marcus running. The Defendant then ran behind Marcus and later went over to Marcus and told him it would be all right. Chad did not see a weapon in Marcus' hand and did not see him pop the trunk of his car, although the trunk had been popped. Additionally, he did not see Marcus hit the Defendant that day.

Officer Teronda Augustine responded to the 911 call regarding the incident at 4:03 p.m. on March 22, 2005. When she got to the scene, the Defendant was in the door of the apartment crying. At that time, Jill approached the Defendant and yelled, "you didn't have to stab him." The Defendant then told Officer Augustine, "I did it, I stabbed him" and handed her a knife. On the way to the police car, the Defendant told Officer Augustine he did not mean to do it and that it was self-defense. Officer Augustine's report indicated Jill stated the Defendant felt that Marcus was going to get a gun from the trunk of his car; therefore, the Defendant felt threatened.

Officer Augustine searched Marcus and the area surrounding him and found no weapons. Officer Augustine was told the trunk of Marcus' car had been popped. Upon approaching the car, Officer Augustine noticed that the trunk was open, so she looked inside the trunk and found no weapons. Officer Augustine testified that the

7

trunk was not fully opened, and that she also looked through the windows of Marcus' car into the front and back seats and saw no weapons. However, the keys were in the ignition. Cameron Snyder, an associate medical examiner, performed an autopsy on Marcus on March 23, 2005. Snyder testified that the knife used to stab Marcus went through the skin, the fat underneath the skin, the abdominal muscles, the colon, the small intestine, and the artery that runs down the left side of the spinal column. Snyder opined that the injury to the artery caused Marcus' death. He testified that the artery that was damaged was located over five inches from the skin surface. Snyder further testified that the blade of the knife admitted into evidence was three to four inches in length. Snyder then explained that an injury deeper than the length of the blade would occur when the blade was pushed farther and deeper into the victim, as in this case. Snyder testified that this type injury indicated a forced or thrusting nature.

The State had the burden of proving the Defendant did not stab Marcus Conway in self-defense; therefore, we must determine whether the Defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that killing Marcus was necessary to save himself from that danger. The standard in La.R.S. 14:20 is whether the Defendant's subjective belief that he was in danger was reasonable. *State v. Brown*, 93-1471 (La.App. 3 Cir. 5/4/94), 640 So.2d 488.

> Factors to consider in determining whether a defendant had a reasonable belief that the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character. *State v. Hardeman*, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. *State v. Brown*, 414 So.2d 726 (La.1982).

8

*State v. Spivey*, 38,243, p. 6 (La.App. 2 Cir. 5/12/04), 874 So.2d 352, 357.

> In cases where the defendant claims self-defense as a justification, the absence of a weapon from the victim's person or immediate reach is often a critical element of the state's proof. See *State v. Davis*, 28,662 (La.App. 2d Cir. 9/25/96), 680 So.2d 1296. . . . The absence of weapon on the victim, however, is not dispositive of the issue.

> La.R.S. 14:20(1) recognizes the additional possibility that a killing may be justified to prevent the infliction of great bodily harm. While weapons may be used to inflict such harm, it is often the case that an opponent who is physically large, powerful or skilled at fighting will inflict great bodily harm upon a weaker adversary.

*State in Interest of D.S.*, 29,554, p. 3 (La.App. 2 Cir. 5/7/97), 694 So.2d 565, 567.

The Defendant argues that he reasonably believed he was in imminent danger of losing his life or receiving great bodily harm and that the killing of Marcus Conway was necessary to save himself from danger. The Defendant further contends that the measurements performed by Officer Augustine at the crime scene give an accurate picture of the small distance between Marcus' vehicle and where the Defendant was located and these measurements had a direct bearing on his ability to retreat or make judgments as to the gravity of the situation.

The Defendant then discusses his ability to retreat and contends that he had no opportunity to do so. He notes that his testimony indicated that once the front door of the apartment closed, it automatically locked. He asserts this was confirmed by Chad's testimony. Additionally, the Defendant contends that once he heard the trunk open he attempted to look at the apartment door to determine if it was open; later he contends he did not have time to see if the door was open, as when he looked behind him to check the door, Marcus was already on him. The Defendant alleges that, at that point, he reasonably felt Marcus had a gun or other dangerous weapon and that he was in immediate peril. The Defendant next points out that Marcus was a large man, measuring just over six feet tall and weighing two hundred thirty-eight pounds.

9

Lastly, the Defendant contends the evidence established the following: 1) Marcus drove to the Defendant's home seeking a confrontation; 2) Marcus was the aggressor, both verbally and physically; 3) Marcus threatened the Defendant, both verbally and physically; 4) Marcus went to his trunk and opened it, either to retrieve a weapon or to act in such a manner as to make the Defendant believe he had a weapon; 5) Marcus physically attacked the Defendant; and 6) the Defendant had no opportunity to retreat.

We will first discuss the Defendant's belief that Marcus was armed with a weapon. The Defendant testified that when Marcus mentioned the next level he thought Marcus was getting into his car to "pull off and come back and take it to the next level." The Defendant further testified that taking something to the next level meant "we're through talking. And we're going to take it to the next level, we're going to get physical." When asked what went through his mind when Marcus' trunk popped, the Defendant testified that alarms started going off in his mind. When he looked toward Marcus' car, Marcus was in the trunk and the Defendant figured he was getting a gun. The Defendant further testified that he was thinking of a way to get to his apartment or for a way out. The Defendant looked at the apartment door, but did not think he could get to the apartment door before Marcus got to him. He further testified that by the time he could take off, Marcus was already on him. The Defendant also testified that he did not see Marcus' hands during that time.

The following exchange occurred regarding whether the Defendant felt Marcus had a weapon:

> Q.   You were concerned that he had a weapon, that's what you're telling us, right? You didn't know what kind of weapon, right? Could have been anything, is that what you're saying?
>
> A.   Yes, sir.

10

Q.      Until you stabbed him?

A.      At first I figured he had a gun, I mean.

Q.      As to that he had a gun, when you have a gun it isn't necessary to hit somebody's face all like you're describing, that doesn't sound like somebody with a gun does it?

A.      When he went to that trunk . . . at that trunk I figured he had a gun.  And I didn't expect him to be . . . and when I looked back around to see where he was at with that gun, I did not expect for him to be on me like he was.

Q.      But doesn't that seem a little strange?  Why would a guy get up in your face with a gun?

A.      I . . .

Q.      Normally would you think . . . cause you've handled fire arms before?

A.      Right.

        . . . .

A.      Well it could have been a knife, it could have been . . . I don't know.

        . . . .

Q.      Didn't you say earlier that if you thought it was a gun you'd have laid down?  Isn't that what you just testified to?

A.      Yeah, if I would have looked up and he had that gun, if I looked at that trunk and he was standing with that gun . . .

        . . . .

A.      I didn't necessarily think he had a gun when he was in my face.  I just . . .

        . . . .


A.      I didn't have time to see a weapon.

11

The Defendant testified that at no time did he intend to kill Marcus or cause him great bodily harm. Additionally, the Defendant testified that he felt his life was in jeopardy and he acted reasonably under the circumstances.

Based on the Defendant's testimony, we find that Marcus punched or swung at the Defendant several times and the Defendant stabbed Marcus. The Defendant testified that, at that point, Marcus was in his face and he did not think Marcus had a gun. The Defendant further testified that Marcus could have had a knife; however, the Defendant then testified "I didn't have time to see a weapon." We find that this testimony indicates that, at the time the Defendant stabbed Marcus, he did not know if Marcus had a weapon or, if Marcus had a weapon, what type of weapon it was.

We find there was conflicting testimony regarding whether Marcus went to the trunk of his car, which was what the Defendant testified led him to believe Marcus was armed with a weapon. Jill testified that Marcus walked to his car door and the physical altercation began. Additionally, Chad testified that Marcus told the Defendant they could take it to the next level and then Marcus sat in his car. We note the Defendant is the only person who testified that Marcus actually went to the trunk of his car.

We will now discuss the Defendant's contention that he could not retreat and the distance the Defendant was from his apartment door at the time he stabbed Marcus. On October 17, 2005, Officer Augustine went back to the scene of the incident to take photographs. She took a photograph of the area of the parking lot where the incident took place. She drew an "X" where the Defendant's apartment was located and a rectangle where Marcus' car was parked at the time of the incident. Officer Augustine testified that Marcus' car was seventeen feet, three inches in length. From the apartment window to the concrete parking stop was nine feet, eight

12

inches. Additionally, from the window to the apartment door was five feet.

Jill testified that the altercation and stabbing occurred by the door of Marcus' car. The Defendant gave conflicting testimony, stating that the incident occurred near the concrete parking stop in the front vicinity of the car and later stating that it occurred by the door of Marcus' car. If the Defendant was in the vicinity of the concrete parking stop, he was approximately fourteen feet, eight inches from the front door of his apartment. However, if the Defendant was by the door of the car, he could not have been more than thirty feet from the door of the apartment at the time he stabbed Marcus.

The Defendant alleges that the door of the apartment locks automatically when it is closed. However, Chad testified that only the screen door was closed when he exited the apartment and saw Marcus running.

We will now discuss the relative sizes of the Defendant and Marcus. The Defendant testified that he was six feet, slightly taller and weighed approximately two hundred eighty-five or two hundred ninety pounds. Marcus was six feet, three-quarter inches tall and weighed two hundred thirty-eight pounds. Accordingly, we submit the Defendant weighed approximately fifty pounds more than Marcus and was two inches taller than he was. Although Marcus was the aggressor in this altercation, the jury may have found that the Defendant's belief that he was in imminent danger of losing his life or receiving great bodily harm was unreasonable. Furthermore, the jury could have chosen to believe the testimony of Jill, who did not see Marcus go to the trunk of his car. The jury could have also found that Marcus popped the trunk of his car, as it was partially open at the time police arrived, yet not actually walked to the back of the car before being stabbed by the Defendant.

Even if the jury found the Defendant was reasonable in his belief that he was in imminent danger of losing his life or receiving great bodily harm, it was not necessary for the Defendant to use deadly force against Marcus. The Defendant was larger than Marcus. Marcus was unarmed and, based on the Defendant's testimony, was merely hitting or swinging at him. There was no evidence presented that the Defendant suffered any injuries as a result of the altercation with Marcus. Further, during the time the Defendant was being struck by Marcus, he had time to retrieve a knife from his pocket, open the knife, and stab Marcus with such force as to push a three-to-four inch knife blade more than five inches into Marcus' body. Additionally, according to the Defendant's testimony, Marcus was not dangerous. The Defendant testified that he had no prior physical altercations with Marcus and, any time he had a problem with Marcus, Marcus would simply leave the Defendant's home. Also, the Defendant made no attempt to retreat and testified that he had no time to get to his apartment. However, the apartment door was, at most, thirty feet away.

By returning the guilty verdict, the jury obviously did not believe the Defendant acted in self-defense. We find that a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the State proved the homicide was not committed in self-defense. Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO & *PRO SE* ASSIGNMENT OF ERROR NUMBER TWO**

In his second assignment of error, the Defendant contends the sentence imposed is constitutionally excessive.

Counsel for Defendant filed a motion to reconsider sentence stating the following: "Mover shows that this sentence is excessive and should be reconsidered by this Honorable Court." "Failure to . . . include a specific ground upon which a

14

motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review." La.Code Crim.P. art. 881.1(E). Defense counsel clearly failed to specify the basis for his motion to reconsider. Accordingly, the "defendant's motion failed to comply with La.Code Crim.P. art. 881.1(E), and, therefore, this court is relegated to a bare claim of excessiveness." *State v. Whatley*, 03-1275, p. 4 (La.App. 3 Cir. 3/3/04), 867 So.2d 955, 958.

> The Eighth Amendment to the United States Constitution and La. Const. art. I, § 20 prohibit the imposition of cruel or excessive punishment. " '[T]he excessiveness of a sentence becomes a question of law reviewable under the appellate jurisdiction of this court.' " *State v. Dorthey*, 623 So.2d 1276, 1280 (La.1993) (quoting *State v. Sepulvado*, 367 So.2d 762, 764 (La.1979)). Still, the trial court is given wide discretion in imposing a sentence, and, absent a manifest abuse of that discretion, we will not deem as excessive a sentence imposed within statutory limits. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713. However, "[m]aximum sentences are reserved for the most serious violations and the worst offenders." *State v. Farhood*, 02-490, p. 11 (La.App. 5 Cir. 3/25/03), 844 So.2d 217, 225. The only relevant question for us to consider on review is not whether another sentence would be more appropriate, but whether the trial court abused its broad discretion in sentencing a defendant. *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> The fifth circuit, in [*State v.*] *Lisotta*, [98-646 (La.App. 5 Cir. 12/16/98),] 726 So.2d [57] at 58, stated that the reviewing court should consider three factors in reviewing the trial court's sentencing discretion:
>
> 1. The nature of the crime,
>
> 2. The nature and background of the offender, and
>
> 3. The sentence imposed for similar crimes by the same court and other courts.

*Whatley*, 867 So.2d at 958-59 (alterations in original).

15

The sentencing range for manslaughter is zero to forty years. La.R.S. 14:31.

The Defendant was convicted of manslaughter and sentenced to thirty-five years at hard labor.

At sentencing, the trial court made the following remarks:

And so there's certainly merit to the State's argument or contention that that is not sufficient provocation for one to act in the way that Mr. Griffin did.

The . . . would that have deprived the average person of cool reflection and the court does not feel that that was sufficient provocation.

The decedent never had a weapon in his hand, I don't believe one was ever recovered at the scene, never threatened with a weapon. He mouthed off, never made it to the trunk of his vehicle. My appreciation again is that he was near the door to his vehicle, mouthed off a little bit. And I listened carefully to the . . . all the testimony at trial. Mr. Griffin did testify at trial.

My appreciation of the case is that he popped the trunk, stood back out of the vehicle and that's when he was stabbed. And it's my appreciation and my belief that he was stabbed before he got to the trunk or before he opened the trunk. Because the trunk had been closed and I believe that testimony was pondered at trial. In other words, nobody saw him get stabbed and then close the trunk or open and close it and then get stabbed. So it was popped but it was never opened. So did he ever actually approach Mr. Griffin with a weapon, well no.

Mr. Griffin's testimony, it was selective, it wasn't too clear, and basically he had his hands in the air at one point but then from that point and he was questioned by the prosecution on these steps. Some how [sic]his hands go from being in the air to having one hand with a knife in it and then opening the knife. Now whether he had to use two hands to open the knife or one, as he testified, and then the decedent is struck with the knife. But the time it took to do these things because from his testimony he had his hands in the air at some point. I don't remember word for word what he was saying but there was [were] words going back and forth, maybe it was words of hold on, let's not go any further, you know. It was not words of war, in other words.

But Mr. Griffin gets from that point to having a knife in his hand, an open knife in his hands. And the Court just could not find the provocation for that. That was an easy way perhaps to end the argument but certainly not justifiable in this case. I just got the impression that Conway was mouthing off, maybe he needed to be scolded for that, maybe he had no business going to Mr. Conway but when someone does

16

that even if incorrect, the issues are much broader until a stabbing occurs. Retreat is an issue that came up in the trial, briefly. But both sides I think pondered retreat.

Mr. Griffin indicated the door would latch behind him and so on. But still we visited the complex I think he could have retreated to his left or to his right. But instead he, I believe, approached the decedent who was near the door where he had popped the trunk and stabbed him.

. . . .

I have reviewed all of the circumstances whether aggravating or mitigating and I'll have to go through some of those now. Whether or not there's an undue risk that during a suspended sentence or probation defendant will commit another crime, I've contemplated that and my feeling is that Mr. Griffin doesn't immediately pose a direct threat to anyone. He's not the kind of person who will break into your home unprovoked and kill you in the middle of the night. He is however has at least this one time shown a propensity to take a short cut and ended someone's life rather than explore other avenues of retreating from a situation.

. . . .

Code of Criminal Procedure Article 894.1 subsection A, subsection 3 most important to the court at this time a lesser sentence would depreciate the seriousness of the defendant's crime and I guess I have typically been very stern with criminal sentences.

. . . .

In the pre-sentence investigation it was not a similar offense but it was a drive-by shooting allegation it had been reduced to I believe aggravated assault and I believe it was 1997. Let me just review that. Yeah, reduced to aggravated assault. So I did necessarily consider that as an aggravating circumstance. . . .

. . . .

The defendant did not contemplate that his conduct would cause or threaten serious harm, I cannot grant the defendant that because when you thrust a 3.5 inch blade into someone's gut, you have to expect serious harm to follow.

The defendant acted under strong provocation we could debate that forever. There was provocation. Was it sufficient for him to react in the manner that he did? . . . But the court has to consider whether that provocation deprived . . . would it have deprived the average person of self-control and cool reflection sufficient for this to just be a

17

manslaughter and also how to ponder that whether it's a mitigating offense or not.

Again the State makes a valid argument that that is not sufficient. You can't have someone come over and mouth off to you and there's not weapon, he's just mouthing off. And you can't . . . there can't be precedent which would allow you to stick them . . . stab them with a 3.5 inch knife of that type or any kind of a knife in the gut. There are too many other methods of retreat.

In *State v. Carrier*, 95-1003 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431, the defendant forcibly entered Ms. Wilson's apartment and shot the victim as he lay in bed. Shortly before the fatal shooting, the defendant pulled a gun on Shannon Lewis, sent a box of condoms to Ms. Wilson, and stalked her apartment while her friends were visiting. The Defendant was charged with second degree murder, but found guilty of manslaughter. This court noted the defendant had only two prior convictions for misdemeanor theft and possession of marijuana; however, he had been arrested on other charges including a concealed weapons charge in Texas. In finding the defendant's forty-year sentence was not excessive, this court cited the following cases:

This court has upheld lengthy sentences for manslaughter. In *State v. Ford*, 94-1440 (La.App. 3 Cir. 4/5/95), 653 So.2d 107, we affirmed a twenty-five year sentence where the defendant killed a person while engaged in the purchase of cocaine. In *State v. Cushman*, 94-336 (La.App. 3 Cir. 11/2/94), 649 So.2d 639, we upheld a thirty year sentence for a manslaughter conviction. In *State v. Darby*, 502 So.2d 274 (La.App. 3 Cir.1987), the defendant was initially charged with second degree murder, but convicted by a jury of manslaughter and given the maximum sentence. This court upheld the sentence noting it was clear the trial court felt the evidence supported a second degree murder verdict which he considered when pronouncing sentence. Such consideration is proper. *State v. Roussel*, 424 So.2d 226 (La.1982); *State v. Heath*, 447 So.2d 570 (La.App. 1 Cir.1984), *writ denied*, 448 So.2d 1302 (La.1984).

*Id*. at 799-800.

Based on *Carrier*, we find the trial court did not abuse its discretion when imposing a sentence of thirty-five years. The trial court in the case at bar felt the

18

evidence did not support a verdict of guilty of manslaughter, as there was not sufficient provocation by the victim. Such consideration was proper pursuant to *Carrier* and *State v. Le*, 98-1274 (La.App. 5 Cir. 6/30/99), 738 So.2d 168, *writ denied*, 00-2174 (La. 4/12/01), 789 So.2d 587. Thus, the Defendant's sentence is not excessive. Accordingly, this assignment of error lacks merit.

### *PRO SE* ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error, the Defendant contends his prosecution for second degree murder constituted double jeopardy.

The Defendant submitted a copy of an indictment filed on April 21, 2005, in docket number 128207 charging him with manslaughter for the death of Marcus Conway. On May 26, 2006, an indictment charging the Defendant with second degree murder for the death of Marcus Conway was filed in docket number 128628.

The Defendant alleges the first indictment was dismissed without reason and contrary to the law. The Defendant additionally asserts that because he was first indicted for manslaughter, he could not later be indicted for second degree murder based on the same set of facts, as this constitutes double jeopardy. Additionally, he was denied his right to contest the second indictment in front of the grand jury.

We find the indictment handed down on April 21, 2005, and information regarding the dismissal of same is not a part of the record in this matter. Accordingly, we will not address Defendant's claim regarding the dismissal of that indictment. Additionally, the record in this matter contains no information regarding the grand jury process and whether the Defendant was present or testified at the proceedings wherein he was indicted for second degree murder. Accordingly, that issue is not properly before this court.

19

We will address, briefly, the Defendant's remaining double jeopardy claim.

Both the United States Constitution and the Louisiana Constitution provide double jeopardy protection to a criminal defendant. The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." *See also* La. Const. art I, § 15. The protection against double jeopardy applies in three situations: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *State v. Smith*, 95-61 (La.7/2/96), 676 So.2d 1068; *and State v. Mayeux*, 498 So.2d 701 (La.1986).

*State v. Walker*, 00-1028, pp. 2-3 (La.App. 3 Cir. 1/31/01), 778 So.2d 1192, 1194, *writ denied*, 01-546 (La. 2/1/02), 808 So.2d 336.

It appears the Defendant did not proceed to trial for manslaughter. Therefore, he was not subjected to a second prosecution for the same offense. Accordingly, double jeopardy is not applicable to the case at bar. For these reasons, we conclude this assignment lacks merit.

## CONCLUSION

The Defendant's conviction and sentence are affirmed.

**AFFIRMED**.