**NOT DESIGNATED FOR PUBLICATION**

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2024 KA 0529

## STATE OF LOUISIANA

## VERSUS

## KELTON L. JOHNSON, JR.

Judgment rendered: **FEB 2 6 2025**

* * * * *

On Appeal from the
Twenty-Second Judicial District Court
In and for the Parish of Washington
State of Louisiana
No. 21-CR5-148028, Sec. H

The Honorable Alan A. Zaunbrecher, Judge Presiding

* * * * *

J. Collin Sims
*District Attorney*
Matthew Caplan
Jason Cuccia
*Assistant District Attorneys*
Covington, Louisiana

Attorneys for Appellee
State of Louisiana

Jane L. Beebe
*Louisiana Appellate Project*
Addis, Louisiana

Attorney for Defendant/Appellant
Kelton L. Johnson, Jr.

* * * * *

**BEFORE: PENZATO, STROMBERG, AND CALLOWAY,[1] JJ.**

---

[1] Retired Judge Curtis A. Calloway, serving as judge *pro tempore* of the Court of Appeal, First Circuit, by special appointment of the Louisiana Supreme Court.

**STROMBERG, J.**

The defendant, Kelton L. Johnson, Jr., was charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. He pled not guilty and, following a jury trial, was found guilty of the responsive verdict of manslaughter, in violation of La. R.S. 14:31. The trial court denied the defendant's motion for new trial and motion for post-verdict judgment of acquittal and sentenced him to thirty years at hard labor. The defendant now appeals, designating three assignments of error. For the following reasons, we affirm the defendant's conviction and sentence.

## FACTS

On April 3, 2021, officers with the Bogalusa Police Department ("BPD") responded to a shooting at a convenience store known as "The Green Store." Officers located the victim, twenty-four-year-old Montrell Quinn, laying face-down in the parking lot with apparent gunshot wounds. Several minutes after the shooting, the defendant called the BPD, identified himself as the shooter, and provided his location; he was subsequently apprehended and brought to the BPD for questioning. Quinn was transported to the hospital where he succumbed to his injuries, and the defendant was later arrested and charged with second degree murder.

## ASSIGNMENT OF ERROR ONE

In his first assignment of error, the defendant asserts the trial court erred in denying his motion for new trial and his motion for post-verdict judgment of acquittal, because the evidence presented at trial was insufficient to support his manslaughter conviction. The defendant does not contest the elements of the offense; rather, he admits that he shot and killed Quinn but argues the homicide was justifiable.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review

2

for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Ordodi**, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. The **Jackson** standard of review, incorporated in La. Code Crim. P. art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. **State v. Labee**, 2022-0995 (La. App. 1st Cir. 2/24/23), 361 So.3d 1072, 1076.

Manslaughter is defined, in pertinent part, as a homicide which would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). When a defendant in a homicide prosecution claims self-defense, the State must prove beyond a reasonable doubt the homicide was not committed in self-defense. **Labee**, 361 So.3d at 1076-77. On appeal, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, a rational factfinder could have found beyond a reasonable doubt the defendant did not act in self-defense. **Id.** at 1077.

Louisiana Revised Statutes 14:20(A) provides four grounds in which a claim of justifiable homicide may be asserted:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would

3

be serious danger to his own life or person if he attempted to prevent the felony without the killing.

(3) When committed against a person whom one reasonably believes to be likely to use any unlawful force against a person present in a dwelling or a place of business, or when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle as defined in R.S. 32:1(40), while committing or attempting to commit a burglary or robbery of such dwelling, business, or motor vehicle.

(4)(a) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

At trial, the jury was instructed on all four theories of justification as well as the aggressor doctrine. On appeal, the defendant relies only on La. R.S. 14:20(A)(1) and (A)(2) to support his argument that no rational factfinder could have found beyond a reasonable doubt he did not act in self-defense.[2]

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21. Reasonableness of the force employed by one claiming self-defense is determined in part by whether the force was proportional to the threat. See **State in the Interest of R.R.B.**, 2022-397 (La. App. 3d Cir. 10/26/22), 353 So.3d 883, 889, writ denied, 2022-01725 (La. 3/28/23), 358 So.3d 496. The defendant's subjective belief he was in danger must be reasonable. Whether the victim of the homicide was armed is not dispositive of a defendant's self-defense claim, but that fact is a relevant consideration for the trier of fact. See

---

[2] The defendant does not argue on appeal, as he did at trial, that the homicide was justifiable to prevent Quinn's unauthorized entry into his vehicle under La. R.S. 14:20(A)(4)(a).

4

**State v. Griffin**, 2006-543 (La. App. 3d Cir. 9/27/06), 940 So.2d 845, 851, <u>writ</u> <u>denied</u>, 2007-0002 (La. 9/14/07), 963 So.2d 995.

At trial, Officer Joseph Seal with the BPD testified he responded to the shooting and observed Quinn on the ground by The Green Store. Before Quinn was transported to the hospital, Officer Seal searched Quinn and recovered a loaded firearm from his back right pocket and a closed pocketknife from another pocket. Officer Seal obtained surveillance footage from The Green Store, which depicted the altercation between the defendant and Quinn.

Officer Christopher McClelland with the BPD testified he also responded to the shooting, and while he was at the crime scene, the BPD was contacted by the defendant who identified himself as the shooter and provided his location. Officer McClelland and Officer Dylan Miller were dispatched to the defendant's location where they detained the defendant and collected the firearm from his vehicle. Officer Miller asked the defendant about the shooting, and the defendant gave his version of events, which was captured on bodycam footage and published to the jury. According to the defendant, Quinn waved a gun around in the parking lot of The Green Store and opened the defendant's passenger door of his vehicle, so he shot Quinn to protect himself and his passengers.

Lieutenant Mitchell Castleberry with the BPD was the lead investigator in the case. Lieutenant Castleberry testified he learned Quinn had died shortly after the shooting and went to the BPD to interview the defendant. After being advised of and waiving his **Miranda**[3] rights, the defendant provided a statement to the police. According to the defendant, he vaguely knew Quinn from high school and denied having any problems or "beef" with him. He claimed that he was driving his car with his friend, Kyle Rawson, and his daughters when he noticed a vehicle following him.

---

[3] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5

The defendant claimed the vehicle passed him, pulled in the parking lot of The Green Store, and the driver, Quinn, jumped out of the car and signaled him to pull in the parking lot. Quinn allegedly started walking around the defendant's car, taunting him and "talking crazy." According to the defendant, Quinn walked to the trunk of his vehicle, pulled out a gun, and began waving the gun around. The defendant stated he put his vehicle in reverse to leave when Quinn opened the passenger door, and the defendant immediately fired four to five shots. He told Lieutenant Castleberry he feared for his life and the lives of his daughters, because Quinn had a gun in his hand.

Subsequent to the interview with the defendant, Lieutenant Castleberry watched the surveillance footage from The Green Store and a video of the altercation recorded by Rawson. He later examined phone records and learned the defendant and Quinn had been communicating via Instagram messages and video chats since January 2021. On April 1, 2021, two days before the shooting, the defendant messaged his girlfriend that he was going to "f*** [Quinn] up[.]" Approximately an hour and a half before the shooting, the defendant and Quinn exchanged the following messages:

> [Quinn:] Boy F*** you[.] Say that sh** to my face and I bet I beat the f*** outta you.
>
> [The defendant:] Pull up then[.]
>
> [Quinn:] To yo[ur] crib?
>
> [The defendant:] Yea[.]
>
> [Quinn:] Say no more.
>
> [The defendant:] Bet[.]

In the midst of the defendant's communication with Quinn, the defendant messaged his friend: "Ima kill [him.]" A few minutes before the shooting, Quinn messaged the defendant to meet him at The Green Store and that he was alone.

6

Lieutenant Castleberry testified the videos depicting the shooting and the communications between the defendant and Quinn contradicted most of the defendant's claims in his interview. Specifically, the investigation revealed the defendant and Quinn knew each other and were not merely acquaintances and Quinn did not have a gun in his hand at The Green Store.

Kyle Rawson, a passenger in the vehicle at the time of the shooting, testified he was unaware the defendant and Quinn had been exchanging messages before the shooting.[4] Rawson said the defendant pulled into the parking lot after observing a vehicle following him, and according to Rawson, the defendant thought the driver was someone "he had an altercation with." Rawson testified the defendant was armed at the time, but he did not observe Quinn with a gun in his hand. Quinn yelled at the defendant to get out of the vehicle, specifically stating: "Put the gun down and get out and fight me like a man." Rawson testified he saw Quinn walk to the trunk of his vehicle and grab something before putting it in his waistband, but he again stated Quinn did not have a gun in his hand. At that point, Rawson began recording the video on his phone. In the video, the song "Casket Fresh" was playing and the defendant stated, "I smoke him with that gun. Free kill[.]" Rawson agreed that Quinn stepped back from the vehicle after he opened the passenger door and before the defendant fired the first shot. Rawson testified Quinn never threatened to shoot or kill the defendant or anyone in the vehicle. However, Rawson said when Quinn opened the door, he assumed Quinn was armed and thought he was going to be shot or stabbed.

Dr. Christy Cunningham, an expert in forensic pathology, conducted Quinn's autopsy on April 6, 2021, which revealed three gunshot wounds to the chest, abdomen, and left thigh. Dr. Cunningham testified the gunshot wound to the chest

---

[4] During his testimony, the State requested and was granted permission to treat Rawson as a hostile witness.

7

was fatal and Quinn would have died within minutes. Dr. Cunningham said there was no soot or stippling on the skin surrounding the wounds, meaning the firearm was fired at least three feet from Quinn. The defendant was thereafter convicted of the responsive verdict of manslaughter.

In finding the defendant guilty of manslaughter, it is clear the jury found the State proved beyond a reasonable doubt the homicide was not committed in self-defense and concluded the use of deadly force against Quinn was neither reasonable nor necessary. While we acknowledge that Quinn was armed and that he and the defendant agreed to meet for some sort of confrontation, we find the evidence, viewed in the light most favorable to the prosecution, bears no characteristic of justifiable self-defense. While Quinn's approach may have caused some general subjective fear on the defendant's part, the jury could have found that his solution to the situation was unreasonable.

The essence of the defendant's claim of self-defense is that he was justified in responding to a fight by shooting Quinn multiple times. We recognize that Quinn escalated the situation by opening the car door. Thus, the jury could have found that the defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances. The jury could have found that the defendant's response to Quinn's alleged agitation and threat to fight was excessive and unnecessary. See **Labee**, 361 So.3d at 1077. The jury heard evidence that prior to the shooting, the defendant messaged his friend that he was going to kill Quinn. The jury also heard the testimony of Rawson that Quinn walked to the defendant's vehicle and opened the door, rather than lunging or jumping toward it. More importantly, the jury saw the surveillance video from The Green Store, which shows Quinn pulled into the parking lot and, within seconds, the defendant parked

8

next to Quinn's vehicle. Quinn did not get out of his vehicle and signal the defendant to stop as the defendant alleged, nor did he have a gun in his hand at any point during the incident. The video does not show Quinn lunge or jump at the car or open the car door violently. Quinn walked toward the car, opened the door and, within seconds, fell backwards.

An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the trier of fact and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418, 422 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found the State proved beyond a reasonable doubt the homicide was not perpetrated in self-defense. Accordingly, this assignment of error is without merit.

### ASSIGNMENT OF ERROR TWO

In his second assignment of error, the defendant argues the trial court erred in failing to allow him to recross examine Rawson after the State brought up a new matter on redirect examination.

Louisiana Code of Evidence article 611 provides, in pertinent part:

> **D. Scope of redirect examination; recross examination.** A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.

Permitting recross examination of a witness is within the sound discretion of the trial court. Absent an abuse of discretion and resulting prejudice, the trial court's ruling will not be disturbed on appeal. When no new issues are raised on redirect examination, recross examination is not proper. See **State v. Maize**, 94-0736 (La.

9

App. 1st Cir. 5/5/95), 655 So.2d 500, 513, <u>writ denied</u>, 95-1894 (La. 12/15/95), 664 So.2d 451.

During redirect examination, the State asked Rawson about a jail call between him and the defendant a few weeks after the shooting.[5] The State questioned whether, during the call, Rawson had joked about making the song "Casket Fresh" his ringtone, as the song had been playing in the background of the video Rawson recorded immediately before the defendant shot Quinn. Defense counsel objected on the basis that the question was irrelevant, was used to damage the defendant's character, and exceeded the scope of cross-examination.[6] In response, the State indicated the testimony was relevant for impeachment purposes. The trial court overruled the defense's objection, and Rawson testified that he had made the joke with the defendant.

On appeal, the defendant argues he should have been allowed to recross examine Rawson about the jail call. However, the defendant did not request an opportunity to recross Rawson nor did he object to the trial court's failure to provide such an opportunity.[7] Under La. Code Crim. P. art. 841(A), a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. **State v. Kitts**, 2017-0777 (La. App. 1st Cir. 5/10/18), 250 So.3d 939, 960, <u>writ denied</u>, 2018-00872 (La. 1/28/20), 291 So.3d 1057. Irregularities or errors cannot be availed of on appeal if they are

---

[5] The jail call was not published to the jury nor is the substance of the jail call included in the record.

[6] Defense counsel also objected based on a discovery violation, arguing the State had a duty to turn over the evidence to the defense but failed to do so. The defendant does not raise any argument relative to the alleged discovery violation on appeal.

[7] We also note the defendant could have elected to recall Rawson as a witness to explore the matter he alleges is newly discovered information, but he failed to do so. See **State v. Turner**, 2019-0777 (La. App. 4th Cir. 5/27/20), 301 So.3d 545, 557 n.8, <u>writ denied</u>, 2020-00813 (La. 10/14/20), 302 So.3d 1113.

not objected to at the time of the occurrence. **State v. Lampley**, 2018-0402 (La. App. 1st Cir. 11/2/18), 265 So.3d 799, 813, <u>writ denied</u>, 2018-1965 (La. 4/8/19), 267 So.3d 612. Thus, the defendant waived any possible error by failing to request the opportunity to recross examine Rawson or to object to the trial court's denial of such a request. Accordingly, we find this assignment of error is not preserved for appellate review.

## ASSIGNMENT OF ERROR THREE

In his third assignment of error, the defendant alleges the trial court erred in denying the defense's motion to remove Kelli Robertson from the jury after granting the State's motion to excuse juror Mark Michel.

In all criminal prosecutions, a defendant has the right to a fair and impartial jury. <u>See</u> U.S. Const. amend. VI; La. Const. art. I, § 16; **Duncan v. Louisiana**, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968). It is essential that all facts considered by the jury be presented in the courtroom with the full protection of the defendant's rights to confrontation and due process. **State v. Lebouef**, 2018-0023 (La. App. 1st Cir. 6/1/18), 2018 WL 2453674, *3 (unpublished), <u>writ denied</u>, 2018-1070 (La. 11/14/18), 256 So.3d 286. If there is a reasonable possibility that extraneous information considered by the jury affected its verdict, a new trial is mandated. **Id**.

When there is an allegation a juror must be replaced, the trial court should hold an evidentiary hearing with all parties to determine if the juror needs to be removed. **State v. Jackson**, 2023-0781 (La. App. 1st Cir. 2/23/24), 384 So.3d 1029, 1037. After trial has commenced, a sworn juror may be removed only if he is deemed "incompetent to serve" because of death, illness, or any other cause that renders him unfit or disqualified to perform his duty as prescribed. See La. Code Crim. P. art. 796; **Jackson**, 384 So.3d at 1037. A trial court may also remove and

replace a juror when the juror has either real or the potential for bias in the deliberations. **Id**. The determination of whether a juror has become unable to perform or disqualified to perform their duty is one made by the trial court in its discretion. See **State v. Derouselle**, 99-3283 (La. 4/28/00), 761 So.2d 1269, 1270 (per curiam).

The defendant's argument on appeal pertains to two jurors, Mark Michel and Kelli Robertson. On the morning of the second day of trial, juror Michel, a commercial salesman at Auto Zone, notified the trial court in chambers that he had a professional relationship with the defendant's father and did not realize the potential conflict until he saw him in the courtroom. When asked if he could be fair and impartial, Michel said he did not know and mentioned he had received a phone call from his boss about the case the night before. Michel said he was concerned about the repercussions of returning a verdict, including the effect a verdict would have on his professional relationship with the defendant's father and his job security. Michel answered affirmatively when asked if he could decide the case based solely on the evidence. The trial court granted the State's motion to excuse Michel, reasoning:

> [O]ftentimes the first thing someone says in response to a question is the best opportunity to get the truth, and in this case, I was concerned when in response to [the State's] question Mr. Michel clearly indicated that he didn't know if he could be fair because of the relationship and his concerns about job security. Either way, that in light of the fact that [the State] indicated and I believe logically that [it] would have exercised a peremptory challenge, the Court is going to grant the motion, excuse Mr. Michel, and bring Alternate Number 1 up to the jury panel.

Defense counsel objected to the ruling and moved for a mistrial, which the trial court denied.

Later, juror Robertson, a nurse practitioner, stated that she recognized Jamika Johnson in the courtroom. Though Robertson did not know her relationship with the

12

defendant, the record reveals that Jamika Johnson is the defendant's mother. Robertson said she did not know the defendant's mother personally, but they worked at the same hospital and the defendant's mother was "a current patient of [hers] within probably the last five years." When asked if she could judge the case fairly, impartially, and based solely on the evidence, Robertson said: "Yes, but I don't feel comfortable . . . assuming there is some kind of relationship between her and him." The trial court noted the popularity of the last name Johnson, and Robertson agreed she could listen to the evidence presented and render a fair verdict based on the law. Defense counsel moved to remove Robertson from the jury, which the trial court denied:

> Her first answer, just like I took as being more probably the truth than not, was that she would still judge this case based on the evidence presented and the law as it is given to her. That is completely different from Mr. Michel who not only hesitated, indicated he didn't think he could. She has repeated no less than three times that she would listen to all the evidence, let the evidence be complete, listen to the law as given to her, and follow it regardless. It's only natural for someone to voice concerns in a case where frankly somebody died and everybody involved in that event lives in the same community. . . Ms. Robertson from the start said, "Nope, I'll listen to the evidence. I'll listen to the law. I'll follow it regardless of the outcome." The motion to strike Ms. Robertson is denied.

Defense counsel again objected to the ruling and moved for a mistrial, which the trial court denied.

On appeal, the defendant argues "[t]he trial court gave no reason why it granted the state's request to replace Michel and denied the defense request to replace Robertson." The defendant notes the jurors' potential biases were similar, and both jurors concluded they could reach a verdict based solely on the evidence presented.

The trial court was in the unique position of hearing Michel's and Robertson's responses in answering the questions, and also being able to observe the manner in which the answers are given, the tone of voice, and the jurors' overall demeanor.

13

Michel indicated he would do his best to follow the law after extensive questioning, but it is clear his connection with the defendant's father troubled him. The trial court listened to his responses, was able to observe his overall demeanor while responding to questions, and determined there was a real potential for bias. We do not find the trial court abused its discretion by removing Michel and replacing him with an alternate juror.

We similarly find no error in the trial court's decision not to remove Robertson from the jury. Unlike Michel, Robertson unequivocally stated she could follow the law and listen to the evidence presented. The trial court provided extensive reasons for its rulings based on its observations of the jurors, and reached its findings based on well-articulated credibility determinations. We find no abuse of discretion in its findings. Therefore, the trial court did not err in denying the defendant's motions for mistrial, in granting the State's motion to remove Michel from the jury, or in denying the defense's motion to remove Robertson from the jury. This assignment of error is without merit.

## PATENT ERROR

Pursuant to La. Code Crim. P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. After a careful review of the record, we have found one patent error.

The record reveals the defendant's sentence was imposed immediately following the denial of his motion for new trial.[8] Louisiana Code of Criminal

---

[8] The trial court also denied the defendant's motion for post-verdict judgment of acquittal immediately before imposing the sentence. However, this court has held that "a trial court's failure to apply La. C.Cr.P. art. 873's 24-hour sentencing delay between the denial of a motion for post-verdict judgment of acquittal and sentencing is neither a patent error nor a valid basis to vacate a

14

Procedure article 873 provides, in pertinent part: "If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately." While a waiver of the delay may be made expressly, "[a]n implicit waiver, however, runs afoul of the plain language of Art. 873[.]" **State v. Kisack**, 2016-0797 (La. 10/18/17), 236 So.3d 1201, 1205 (per curiam), cert. denied, 583 U.S. 1160, 138 S.Ct. 1175, 200 L.Ed.2d 322 (2018). Here, there was no explicit waiver of the delay following the denial of the motion for new trial. Nevertheless, in **State v. Augustine**, 555 So.2d 1331, 1333-34 (La. 1990), the supreme court found the failure to observe the twenty-four-hour delay to be harmless error where the defendant could not show he suffered prejudice. The supreme court concluded no prejudice would be found if the defendant did not challenge the sentence imposed and the violation of the twenty-four-hour delay was merely noted on patent error review. **Id.** at 1334. Because the defendant has not assigned error to the trial court's failure to observe the twenty-four-hour delay nor has he contested the sentence imposed, we find this patent error is harmless. See **State v. Cyprian**, 2021-0287 (La. App. 1st Cir. 12/22/21), 340 So.3d 271, 287-88.

Accordingly, we affirm the defendant's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED.**

---

sentence when assigned as error." **State v. Stalls**, 2023-0829 (La. App. 1st Cir. 9/26/24), ___ So.3d ___, 2024 WL 4298033, *8.

15