502 So.2d 274 (1987)
STATE of Louisiana
v.
Floyd DARBY.
No. Cr86-735.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1987.
*275 Alfred F. Boustany, II, Lafayette, for defendant-appellant.
Danny Landry, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before DOMENGEAUX, GUIDRY and KNOLL, JJ.
GUIDRY, Judge.
Defendant, Floyd Darby, was indicted by a grand jury on July 10, 1984, for a violation of La.R.S. 14:30.1, second degree murder, in connection with the May 1984 death of Linda Joe. The case was tried to a jury of twelve persons commencing on March 31, 1986, and on April 2, 1986, the jury returned a unanimous verdict of guilty of manslaughter, a lesser, but responsive, verdict under La.C.Cr.P. art. 814 A(3). A pre-sentence investigation report was ordered prepared and subsequently, on May 29, 1986, the trial judge sentenced the defendant to twenty-one (21) years at hard labor, the maximum penalty for a conviction on the charge of manslaughter. From that conviction and sentence, the defendant now appeals specifying four assignments of error:
1. Errors patent on the face of the record.
2. Trial court erred in not considering the sentencing guidelines contained in La.C.Cr.P. art. 894.1 when he sentenced the defendant.
3. Trial court erred in that the imposition of the maximum sentence for a conviction of manslaughter was constitutionally excessive.
4. Trial court erred in that the decision of the jury was erroneous as the evidence did not prove the guilt of the defendant beyond a reasonable doubt.
The victim, Linda Joe, died of a slashed throat sometime between 12:00 midnight and 1:30 a.m. on Tuesday, May 22, 1984, in her garage apartment at 109½ East Spring Street in the City of Lafayette. Besides having her throat slashed, the victim had also been stabbed in the back and had a belt cinched around her neck.
The defendant, who was still married to Priscilla Darby, had begun dating the victim in December 1983. Sometime in February 1984, Floyd began living part-time with Linda in her apartment. Floyd and Linda were last seen together at approximately 10:00 p.m. on the night of May 21, 1984, only two to three hours before Linda was slain.
Following the discovery of Linda's body by her brother, shortly after 7:00 a.m. the morning of May 22, 1984, it was established that the defendant's whereabouts were unknown and a warrant for his arrest was issued. The defendant voluntarily surrendered himself to the Lafayette police shortly after midnight, May 24, 1984.
*276 For the sake of convenience and coherency we will address defendant's assignments of error in reverse order.

ASSIGNMENT OF ERROR NO. 4
There were no eyewitnesses to the crime. Evidence supporting defendant's conviction is for the most part circumstantial.
A search of the murder scene revealed two knives which tested positive for traces of human blood, one partially under the bed on which the victim was found and the other under the "dirty clothes" hamper in the bathroom. Neither knife contained any identifiable fingerprints. A bloody left hand print which possessed the same characteristics as that of the defendant's was found on the bottom bed sheet. Near the bed were a pair of sneakers belonging to the defendant which had traces of human blood on them. A pair of "Rustler" blue jeans of the same size as that worn by the defendant, which jeans defendant admitted could be his, contained traces of human blood and were discovered "buried" under other soiled clothes in the bathroom hamper. Blood smears were found on a kitchen drawer in which utensils were stored (such as the two knives) and on a light switch plate in the kitchen. No finger prints were recoverable from either of the last two items.
At trial, the defendant, testifying in his own behalf, stated that he cared for the victim and that during the entire course of their relationship they never fought or even argued. Marie Joe, the victim's mother testified that she had knowledge of the two arguing on several occasions and that on the Sunday night before she was killed Linda had come to the main house from her rear garage apartment complaining that "Floyd was after her". Linda requested and was granted permission by her mother to spend the night. While the defense was able to elicit testimony from Mrs. Joe that she had never seen Linda and Floyd argue, the witness never recanted her statement that the two had argued on several occasions and that on each occasion Linda "would come at home".
Additionally, Leroy Thibodeaux, Jr., a 16-year-old neighbor, testified that he both saw and heard the victim and the defendant in a loud argument between 9:00 p.m. and 10:00 p.m. on May 21, 1984, in the pasture next to his house.
On the day defendant turned himself in to the Lafayette police, he gave a statement in which he claimed he left the victim at approximately 9:00 p.m., met a friend, Chester Narcisse, at Ike's Pool Hall and that he and Chester drank beer until approximately 11:30 p.m., at which time they picked up Clarence Hebert, Chester's brother-in-law. According to Darby, the three men then rode around until about 3:30 a.m. when he dropped off the other two men in the 200 block of Gauthier Road. At trial, Darby testified somewhat differently, stating that he didn't leave Linda Monday night until after the news was over (indicating about 10:30 p.m.) and that he dropped off Chester at about 12:30 a.m. at Chester's house, but that he and Clarence continued to ride around until sometime between 2:00 a.m. and 3:00 a.m. The defendant claimed that he continued to ride around for sometime after he parted company with Clarence. Chester Narcisse verified that the defendant dropped him off at about 12:30 a.m. at home and that at the time Clarence Hebert was still in defendant's auto.
Clarence Hebert was not called to testify by either side at trial. The defense, in brief, alleges that Hebert's whereabouts were known to the State and that he was subpoenaed to testify. The record before us does not substantiate this allegation. It does show, however, that the defense was granted open discovery of the State's file.
Darby claimed that he returned to Linda's apartment sometime between 3:00 and 4:00 a.m., got undressed in the dark and got into bed with the victim. According to the defendant, he hugged Linda with his right hand and, upon finding her damp, asked her if she wanted him to turn on the bedside fan. When he got no response and, upon realizing that his hand was "sticky" from Linda's "dampness", he got *277 up, turned on the light and discovered the body. At that point, defendant claimed he panicked, got dressed and ran.
Gloria Thibodeaux, a neighbor who was up with her baby in the early morning hours of May 22, 1984, testified that she heard a car she believed to be Floyd Darby's drive up to Linda's apartment at approximately 1:00 a.m. and depart about one hour later.
Between the time he left the scene of the killing and when he turned himself in to the police, it was established that Darby visited his wife, stopped at his mother's home (where he stole about $200.00), fled to Slidell and finally to Tallahassee, Florida. According to the defendant, it was not until he got to Tallahassee that his head "had got kind of straight" and he decided to return to Lafayette.
The prosecution pointed out to the jury that, because of the position of the victim's body on the bed (diagonally across from head to opposite foot), the defendant's story of getting into bed and "hugging" Linda lacked credibility. The State's attorney also pointed out that, although the defendant claimed to have hugged the victim with and gotten a bloody right hand, it was a left hand print which was found on the sheet. One of the police officers who investigated the crime scene testified that the mattress was hanging over the box spring on the side of the bed the defendant claims to have entered. This fact, the district attorney opined, made it highly unlikely that the mattress could have supported Darby's weight had he attempted to lay on that side of the bed, as he claimed.
The State also argued, and we find logically so, that a stranger entering the apartment and killing the young woman would not have taken off and hidden his blood stained jeans on the premises to leave in his underwear. Finally, the prosecutor asked, if the defendant's story of disrobing before he got into bed and found the body were true, how did blood stains get on defendant's shoes and on the jeans in the dirty clothes hamper, especially since Floyd testified that he washed the blood off of his hand before he redressed.
In order for this court to uphold the defendant's conviction, we must, after examining the record, conclude that defendant's conviction was based upon sufficient evidence. The Louisiana Supreme Court enunciated the test which a reviewing court should apply in evaluating the sufficiency of the evidence in State v. Wright, 445 So.2d 1198 (La.1984), rehearing denied, wherein the court stated:
"The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Where circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that: `Assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'
This Court has recognized that R.S. 15:438 is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis for the conviction. State v. Austin, 399 So.2d 158 (La.1981). Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. R.S. 15:438 provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. As we stated in *278 State v. Chism, 436 So.2d 464 (La.1983). La.R.S. 15:438 `may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, [but] it emphasizes the need for careful observance of the usual standard, and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence.'"
See also State v. Martin, 458 So.2d 454 (La.1984), rehearing denied; and, State v. Garcia, 483 So.2d 953 (La.1986), rehearing denied.
La.R.S. 14:30.1 defines second degree murder as the killing of a human being:
"(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm."
La.R.S. 14:31 defines manslaughter as:
"(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1."
In order to convict defendant of second degree murder, the State had the burden of proving that defendant had the specific intent to kill or inflict great bodily harm upon the victim. The severity of the knife wounds (either of which could have resulted in death in the opinion of the coroner) plus the belt cinched around the victim's neck leaves no doubt as to the perpetrator's intent. Thus, the homicide could only properly fit under section one of either statute, i.e., that section requiring the perpetrator to have specific intent to kill or inflict great bodily harm.
Accordingly, one would assume that for the jury to properly return a verdict of "guilty of manslaughter", evidence proving heat of blood sufficient to deprive an average person of his self-control or cool-reflection necessarily must have been placed before them. This, however, need not (as was the situation here) be the case. In State ex rel. Elaire v. Blackburn, 424 So.2d 246 (La.1982), rehearing denied, the Louisiana Supreme Court explained:
"It is important to distinguish between those responsive verdicts which are lesser and included grades of the charged offense and those responsive verdicts which are not lesser and included offenses but are nevertheless included in La.C.Cr.P. Art. 814. Lesser and included grades of the charged offense are those in which all of the essential elements of the lesser offense are also essential elements of the greater offense charged. State v. Cooley, 260 La. 768, 257 So.2d 400 (1972). Thus, the evidence which would support a conviction of the charged offense would necessarily support a conviction of the lesser and included offense.
. . . . .
However, in cases of the legislatively provided responsive verdicts which are not truly lesser and included grades of the charged offense, evidence which would support a conviction of the greater *279 offense would not necessarily support a conviction of the legislatively responsive offense. In such cases, the evidence may be insufficient to establish an essential element of the lesser crime which is not an essential element of the greater crime.
In State v. Peterson, 290 So.2d 307 (La.1974), the defendant was charged with murder, and the jury returned a responsive verdict of manslaughter. Defendant argued that the evidence did not support the verdict because there was no proof of "sudden passion" or "heat of blood". La.R.S. 14:31. The court held that passion is not an essential element of the lesser offense of manslaughter, but rather is a mitigating factor, in the nature of a defense to the crime of murder, which need not be proved by the prosecution. However, the court in dicta stated that when the evidence is sufficient to support a conviction of the greater offense charged, the reviewing court need not determine whether the evidence supports the responsive verdict returned by the jury. Stated otherwise, the jury may return any legislatively provided responsive verdict, whether or not the evidence supports that verdict, as long as the evidence was sufficient to support a conviction of the charged offense." (Citations omitted).
The court then went on to make the general statement:
"It would be unfair to permit the defendant to have the advantage of the possibility that a lesser "compromise" verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object. Therefore, at least when the defendant fails to interpose a timely objection to a legislatively responsive verdict, this court will not reverse the conviction if the jury returns such a verdict, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged." (Citations omitted).
State ex rel. Elaire, supra, at 251, 252.
We have reviewed the evidence presented and find that, under the test enunciated by the Supreme Court in State v. Wright, supra, it was sufficient to support a conviction of the offense charged. Accordingly, this assignment of error lacks merit.

ASSIGNMENTS OF ERROR NOS. 2 AND 3
Since both of these assignments involve sentencing, we will deal with them together. By these assignments, appellant complains that the sentence imposed is excessive and that in imposing the sentence, the trial judge failed to comply with La.C.Cr.P. art. 894.1.
In sentencing the defendant to the maximum term for manslaughter, the trial judge stated:
"The Court will sentence you to serve twenty one (21) years at hard labor in custody of the Department of Safety and Corrections. This was a henious crime, an atrocious crime. The Court is convinced that you are a danger to society and should not be released until your term is over. That you are in need of institutionalization. That to give you a lesser sentence in this situation would deprecate the seriousness of this crime. The Jury was extremely lenient with you; that's my opinion. I'm not the Jury.
If ever manslaughter deserved twenty one years, this is the case. There has been no evidence of remorse that I have seen. The Court is satisfied that this judgment is justified."
Claims of excessiveness of sentence and non-compliance with La.C.Cr.P. art. 894.1 have been addressed by every reviewing court in the State. The Supreme Court in State v. Thomas, 447 So.2d 1053 (La.1984) stated:
"Article I, § 20 of the 1974 Louisiana Constitution prohibits the imposition of excessive punishment. State v. Sepulvado, *280 367 So.2d 762 (La., 1979). A sentence is unconstitutionally excessive when it is grossly out of proportion to the severity of the offense or inflicts unnecessary pain and suffering. State v. Reed, 409 So.2d 266 (La., 1982). A sentence within the statutory range may be excessive when considered in light of the individual defendant and the circumstances of his crime. State v. Quebedeaux, 424 So.2d 1009 (La., 1982); State v. Grey, 408 So.2d 1239 (La., 1982); State v. Sepulvado, supra."
Recently our brethren of the Fifth Circuit, with whom we agree, declared in State v. Barnes, 491 So.2d 42 (La.App. 5th Cir.1986):
"... In determining whether or not a sentence was excessive, the Louisiana Supreme Court held in State v. Bonanno, 384 So.2d 355, 358 (La.1980) that:
"[a]s stated previously, to determine whether a certain penalty is excessive we must determine whether that penalty is grossly disproportionate to the severity of the crime. State v. Goode, [380 So.2d 1361 (La.1980) ] supra. To determine whether the penalty is grossly disproportionate to the crime we must consider the punishment and the crime in light of the harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock our sense of justice. State v. Beavers, 382 So.2d 943 (La.1980)."
Absent a sentence that shocks our sense of justice, the trial judge is given great discretion in the imposing of sentences. State v. Lanclos, 419 So.2d 475 (La.1982). "Absent a manifest abuse of that discretion the sentence imposed by a trial judge should not be set aside as excessive." Id. at 478."
See also State v. Richardson, 479 So.2d 698 (La.App. 3rd Cir.1985), writ denied, 484 So.2d 134 (La.1986); and, State v. Francis, 482 So.2d 154 (La.App. 4th Cir.1986).
In State v. Davis, 448 So.2d 645 (La. 1984), the court further stated:
"The Code of Criminal Procedure sets forth the items which must be considered by the trial judge before passing sentence. C.Cr.P. 894.1. The trial judge need not recite the entire checklist of article 894.1, but the record must reflect that the judge adequately considered the guidelines. State v. Soco, 441 So.2d 719 (La.1983); State v. Trahan, 412 So.2d 1294, 1296 (La.1982). The judge must, in effect, justify his sentence with factual reasons. State v. Soco, supra; State v. Jones, 398 So.2d 1049, 1052 (La.1981).
Even in the absence of adequate compliance with the mandate of article 894.1, it is not necessary for this court to remand the matter for resentencing in compliance with the article when the sentence imposed is not apparently severe in relation to the particular offender or the actual offense committed. State v. Jones, 381 So.2d 416 (La.1980)...."
See also State v. Abbott, 489 So.2d 1067 (La.App. 1st Cir.1986); and, State v. Hawkins, 490 So.2d 594 (La.App. 2d Cir.1986).
It is abundantly clear from his sentencing colloquy that the trial judge felt that the evidence supported a verdict of guilty of second degree murder and that he took that into consideration when pronouncing sentence. This, of course, is perfectly proper. State v. Heath, 447 So.2d 570 (La.App. 1st Cir.1984), writ denied, 448 So.2d 1302 (La.1984); State v. Roussel, 424 So.2d 226 (La.1982).
Further, the trial judge remarked on the heinous nature of the crime, the victim had been stabbed in the back, a belt tightened around her neck in an attempt to strangle her and then her throat was slashed. The trial judge also commented on the defendant's lack of remorse. Under these circumstances, we find the trial judge adequately complied with La.C.Cr.P. art. 894.1.
We recognize that maximum sentences must be reserved for the most egregious and blameworthy of offenders. State v. Lathers, 444 So.2d 96 (La.1983); State v. Walker, 476 So.2d 1158 (La.App. 3rd Cir. 1985). Considering the nature and gravity of the offense (the harm caused to society *281 by the crime), we do not find the penalty in this case so disproportionate to the crime as to shock our sense of justice. These assignments also lack merit.

ASSIGNMENT OF ERROR NO. 1
Our examination of the record reveals no errors patent on its face. This assignment lacks merit.
Accordingly, for the reasons assigned, the conviction and sentence of the defendant are affirmed.
AFFIRMED.
DOMENGEAUX, J., concurs.