NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-623

STATE OF LOUISIANA

VERSUS

MALCOLM JAMES SIMON
A/K/A MALCOLM SIMON
A/K/A MALCOLM J. SIMON

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. 118637, DIV. C
HONORABLE BYRON HEBERT, DISTRICT JUDGE

**********

J. DAVID PAINTER
JUDGE

**********

Court composed of Elizabeth A. Pickett, J. David Painter, and James T. Genovese, Judges.

AFFIRMED.

Mark O. Foster, Attorney at Law
P.O. Box 2057
Natchitoches, LA 71457-2057
Counsel for Defendant-Appellant:
    Malcolm James Simon a/k/a Malcolm Simon a/k/a Malcolm J. Simon

Patrick Magee, Assistant District Attorney
Fifteenth Judicial District
P.O. Box 91847
Lafayette, LA 70509-1847
Counsel for Appellee:
    State of Louisiana

Malcolm James Simon, In proper Person
Cajun 3 C-1

**Avoyelles Correctional Center**
**1630 Prison Road**
**Cottonport, LA 71327**
**Defendant**

**PAINTER, Judge.**

Defendant, Malcolm James Simon a/k/a Malcolm Simon a/k/a Malcolm J. Simon, appeals his conviction and sentence on the charge of manslaughter. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early evening of September 22, 2007, Defendant shot Michael Onezine, nicknamed "Tee Mike," in the face. The victim died as a result of the gunshot wound. Defendant was indicted on January 16, 2008, on the charge of second degree murder, a violation of La.R.S. 14:30.1. He filed a "Motion to Suppress" statements, which was denied following a hearing. A jury found Defendant guilty of manslaughter, a violation of La.R.S. 14:31. The trial court ordered a presentence investigation report, and on December 16, 2008, Defendant was sentenced to thirty years at hard labor, with credit for time served. Defendant filed a "Motion and Order to Reconsider Sentence," which was denied without a hearing.

Defendant now appeals, alleging four assignments of error contending: (1) that there was insufficient evidence to sustain the verdict of manslaughter and that the State failed to prove Defendant's actions were not self-defense; (2) that the trial court erred when it denied Defendant's motion for mistrial based on the illegal admission of bad acts evidence; (3) that the trial court erred when it denied Defendant's motion for a mistrial based on the State's failure to timely provide witnesses' statements; and (4) that the sentence was excessive under the circumstances of the case.

Additionally, Defendant filed four *pro-se* assignments of error: (1) The trial court erred when it denied Defendant's motion to suppress statements; (2) The evidence was insufficient to support a conviction for manslaughter, and the trial court

1

erred when it denied Defendant's self-defense claim; (3) "It was unduly prejudicial to Mr. Simon for the court to disclose circumstantial evidence that did not exclude every hypothesis of innocence;" and (4) The trial court failed to give a sufficient factual basis to support the sentence of thirty years at hard labor.

For the following reasons, we find all of Defendant's assignments of error to be without merit and affirm his conviction and sentence.

## DISCUSSION

### *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After a thorough review of the record in this case, we find that there are no errors patent.

### *Self-Defense*

We first address Defendant's claims that there was insufficient evidence to sustain the verdict of manslaughter and that the State failed to prove Defendant's actions were not self-defense. Defendant was charged with second degree murder but convicted of the responsive verdict of manslaughter. Defendant argued at trial that he acted in self-defense. He argues that the State failed to meet its burden of proving that his actions were not self-defense. He contends that the victim was known for his violent tendencies. Because the victim had stabbed him in the past and had threatened him earlier in the day, Defendant argues that he reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm; therefore, he claims that his actions were justified.

Justifiable homicide is permitted "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving

2

great bodily harm and that the killing is necessary to save himself from that danger." La.R.S. 14:20. In the case of a homicide wherein the defendant claims self-defense, the State has the burden of proving that he did not act in self-defense. *State v. Hargrave*, 05-1027 (La.App. 3 Cir. 3/1/06), 926 So.2d 41, *writ denied,* 06-1233 (La. 11/22/06), 942 So.2d 552. While reviewing the sufficiency of the evidence to support a conviction, we must determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).

At trial, twelve witnesses, excluding police officers, experts, and Defendant, testified as to the events of September 22, 2007. All the events occurred around Frank Street, between Georgia and Simcoe Streets, in Veazey, Louisiana.

The first witness to testify was Joshua McZeal, who was a co-defendant in the case. The gun used to shoot Onezine belonged to McZeal. After the shooting, McZeal disposed of the gun. The gun was never found. McZeal was originally charged as a principal in the case but pled guilty to accessory after the fact.

McZeal testified that sometime in the morning on the day of the shooting, he met Defendant in the neighborhood. They visited around the neighborhood, then in the afternoon, Defendant had his first encounter with the victim. Onezine and Defendant had words, and Defendant wanted to fight, but McZeal got between them. McZeal testified that at first Onezine did not have a knife, but then he pulled out a knife. McZeal stated that a friend of Onezine's, Emmanuel Anderson, got in between them and told Defendant that he would fight him instead. Onezine and Anderson then started to leave the area, but first Onezine dropped to his knees and told Defendant,

3

"Like my mama's standing out here, I swear to god you can't walk the streets tonight."

McZeal testified that later in the evening, he, his wife, Anderson, and Defendant were standing around McZeal's car in front of his aunt's house on Frank Street, when Defendant asked McZeal if he could borrow his gun, which was in the car's seat compartment. McZeal told him no. He testified that Defendant was afraid that he was going to get jumped that night. A few minutes later, Defendant asked for something out of the car, and McZeal unlocked the car. Shortly thereafter, Defendant wandered away. Then they heard shots down the street. McZeal's gun was no longer in the car. He saw Defendant run back from down the street and toss something into the roadside ditch as he ran away. McZeal retrieved the gun and drove to Heymann Park where he threw the gun into the bayou.

McZeal testified that Defendant was not known as a troublemaker around the neighborhood but that Onezine was known as a troublemaker and always carried a weapon. He said that Defendant was scared of Onezine.

Several of the witnesses who lived in the neighborhood, or were visiting there, testified that they either witnessed or heard that Onezine had several confrontations the day of the shooting. Noelton Cross, Jorajure Woods, Deidre Prejean, Paris August, Trudy Lewis, Calvin Francis, Jr., and Emmanuel Anderson all testified that Onezine had up to four encounters with various people throughout the day, encounters which included jumping into his car to make a getaway, driving over a neighbor's mailbox, and hitting someone on the head with a hammer. There was also testimony that the police had been called on a few of these occasions.

4

Most of the above listed witnesses testified that although they did not see Defendant shoot the victim, they heard the shots and saw Defendant run away. August testified further that as Defendant ran past her, she heard him scream, "I got him. I got him. He fell like a bitch." Lewis also testified that she heard Defendant yell as he was running away from the area that he "got Tee Mike."

Jocelyn Lawrence, Trent Mitchell, and Quentin Isadore were with the victim at some point as he walked down Frank Street, and they saw Defendant walking toward him with the gun. Lawrence testified that she and Onezine were going to the store to cash a counterfeit one hundred dollar bill so she could buy crack cocaine from him when they saw someone walking toward them. She stated that because she did not have on her glasses, she could not see who it was. She said that Onezine had a "big" knife. She stated that Onezine stopped to talk to Isadore, "Paw Paw," and she walked on ahead. She said that she heard shots and saw someone running away. She said that the shooter was standing approximately three houses away when he fired the gun.

Mitchell testified that he was with the victim earlier in the day and then met up with him again early evening. Onezine told him that he had an argument with Defendant that afternoon. Mitchell said that he was not sure if Onezine had a knife on him. As they were walking down Frank Street, Isadore rode up to them on his bike and stopped to talk. Mitchell testified that when the shots started, Onezine turned and attempted to run away but dropped immediately into the ditch. He said that Onezine had not been threatening Defendant and that the shots were fired from about three houses away. At trial, Mitchell initially stated that he was not sure that

5

Defendant was the shooter, but he later admitted that in the statement he made to the police, he had said it was Defendant who was the shooter.

Isadore testified that he was riding his bike on Frank Street early in the evening when he saw both Defendant and Onezine. He stated that he rode past Defendant and stopped to talk to Onezine, who had been walking with a lady, when shots rang out. He did not see Onezine with a knife. Isadore admitted that when he spoke with the police, he told them that as he passed Defendant, he asked, "up's?," and Defendant said that he was going to kill Onezine. However, Isadore also admitted that he told the police that during the earlier confrontation between Defendant and Onezine, Onezine pulled out a knife and said to Defendant that "he was going to kill him later."

While a majority of the witnesses above stated that they did not see the victim with a knife the day of the shooting, Jean Paul Broussard, one of the paramedics who attended to the victim, testified that he found a large knife when he rolled the victim onto the spine board.

Defendant testified that he and McZeal first encountered the victim while the victim was arguing with another person. Defendant said that he asked Onezine, "Why he was doing that?" Then Onezine started cursing him. Defendant testified that he and Onezine cursed each other, that he asked Onezine if he wanted to fight, and that Onezine said no. Onezine then left but came back with someone else who wanted to fight with Defendant. Defendant told the second person that he did not want to fight him. That was when Onezine told Defendant that he could not walk "the streets no more." Defendant stated that Onezine then left and went down to Georgia Street.

6

Defendant testified that he was scared. He said that Onezine had cut him in the past, but the police did not do anything about it because "the cut wasn't big enough." He said that in the early evening, while he was with McZeal in front of Anderson's house on Frank Street, he asked McZeal for the gun. Defendant said that he stayed for a while, then began walking down the street toward Georgia Street and saw the victim walking toward him on the other side of the street. When Onezine saw him, he pulled a knife. Defendant pulled the gun out, and Onezine began running toward him. Defendant testified that he shot into the air twice, but Onezine kept running toward him, so he lowered the gun and shot again. Defendant testified that when he lowered the gun, he was aiming for the victim's legs.

Defendant's statement, given the day after the shooting, was published to the jury. In the statement, Defendant told the police officer that Onezine began to run away from him after he started shooting. When asked whether Onezine was a threat then, since he was running away, Defendant answered, "Well he was a threat to me before I pulled out the gun 'cause he had the knife out in his hand and he was walking my way." Defendant told the police officer that Onezine was about twenty to thirty feet away when he began shooting.

To determine self-defense, a defendant's actions are subjected to a twofold inquiry:

> 1) whether, from the facts presented, the defendant could reasonably have believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. *State v. Woodhead,* 03-1036 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, 999-1000, *writ denied,* 04-0598 (La.7/2/04), 877 So.2d 144. Furthermore, LSA-R.S. 14:21 states that "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of

7

self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict."

*State v. Jackson,* 06-565, p. 5 (La.App. 5 Cir. 12/27/06), 948 So.2d 269, 272-73.

We find that the State met its burden of proving that Defendant did not act in self-defense when he purposefully armed himself with a gun and stayed in an area where he knew the victim would be. As noted above, the ability to retreat from such confrontation may be considered when determining whether Defendant had a reasonable belief that deadly force was necessary to avoid the danger. During cross-examination, Defendant admitted that later in the early evening, after the first encounter with the victim, he left Anderson's house and turned left to go toward Georgia Street instead of turning right to go home. Although Defendant testified that Onezine began running toward him after he pulled out the gun, his statement to the police was that Onezine attempted to run away. Furthermore, it was Defendant who wanted to fight during the first confrontation.

Two more factors to be considered when deciding whether a defendant's claim of self-defense is valid are the excitement and confusion of the situation and the defendant's knowledge of the assailant's bad character. *State v. Nelson,* 34,077 (La.App. 2 Cir. 12/6/00), 775 So.2d 579. While all the witnesses testified that Onezine was having a day full of conflicts, all three witnesses that were with Onezine at the time of the shooting testified that he, Mitchell, and Isadore were having a conversation and that Onezine was not threatening Defendant in any way. Moreover, two of the witnesses testified that the shooter was three houses away from Onezine when he began shooting. Two of the witnesses also testified that Onezine tried to get away. In order for Defendant's actions to be justified, the force used against Onezine

8

must have been reasonable under the circumstances and apparently necessary to have prevented an imminent assault. *See State v. Salter,* 31,633 (La.App. 2 Cir. 2/24/99), 733 So.2d 58, *writ denied,* 99-990 (La. 9/24/99), 747 So.2d 1114. Testimony established that Defendant was a fair distance (twenty to thirty feet, by his own admission) from the victim when he began shooting.

While there was conflicting testimony as to whether the victim had a knife or was known to carry a weapon, when confronted by conflicting testimony, "the determination of that fact rests solely with the judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence." *State v. Mills,* 04-489, pp. 7-8 (La.App. 5 Cir. 3/29/05), 900 So.2d 953, 960, *writ denied,* 05-1470 (La. 1/13/06), 920 So.2d 235. We find that based on the evidence, a rational trier of fact could have concluded that the State met its burden of proving beyond a reasonable doubt that Defendant was not acting in self-defense when he shot the victim.

Defendant further contends that the State did not prove the elements of manslaughter beyond a reasonable doubt. Louisiana Revised Statutes 14:31(A)(1) defines manslaughter, in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

9

Defendant, in his *pro-se* brief, argues:

> The state must prove four elements beyond a reasonable doubt to sustain a manslaughter conviction. First, that Mr. Simon killed Mr. Onezine, second, that Mr. Simon had the specific intent to kill or commit great bodily harm, third, that the killing was committed in **sudden passion** or **heat of blood IMMEDIATELY** caused by provocation sufficient to deprive an average person of his self-control and cool reflection, and fourth, that Mr. Simon's blood had not actually cooled or that an average person's blood would not have cooled at the time the offense was committed.

"Sudden passion" or "heat of blood" are not elements of the offense of manslaughter but rather are mitigation factors exhibiting a degree of culpability. *State v. Johnson*, 06-623 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, *writ denied,* 06-3024 (La. 9/14/07), 963 So.2d 995. The mitigating factors which would have reduced the offense from second degree murder to manslaughter were not present. Accordingly, the State was not required to prove Defendant committed manslaughter. In this case, manslaughter was a responsive verdict to the charge of second degree murder. La.Code Crim.P. art. 814(A)(3). A trier of fact may return any legislatively provided responsive verdict whether or not the evidence supports that verdict, as long as the evidence was sufficient to support a conviction of the charged offense. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 249 (La.1982), *cert. denied,* 461 U.S. 959, 103 S.Ct. 2432 (1983). The charged offense was second degree murder.

Second degree murder, in pertinent part, is defined as "the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm." La.R.S. 14:30.1(A). We find that Defendant's actions exhibited the specific intent to kill or inflict great bodily harm on the victim. The initial threat that Onezine allegedly made against Defendant was hours before the shooting, and testimony established that Defendant may well have been the aggressor. Defendant had the

10

opportunity to leave the area but chose not to, armed himself, and set out to find the victim. By his own admission, he fired at the victim almost as soon as he saw him coming down the street. Witnesses reported that Defendant was exuberant afterwards, shouting out, "I got him, I got him." Defendant fled the scene immediately after the shooting, hardly appropriate actions for one who claims he meant only to protect himself by shooting warning shots into the air, then aiming for the victim's legs.

Based on the foregoing, a rational trier of fact, after viewing the evidence in the light most favorable to the State, could have found that Defendant committed second degree murder beyond a reasonable doubt. Accordingly, the responsive verdict of manslaughter was a compromise and valid verdict. Thus, we find no merit to this assignment of error.

*"Bad Acts" Evidence*

Defendant contends that the trial court erred when it denied his motion for a mistrial based on the State's attempt to solicit inadmissible other "bad acts" evidence from a witness. At trial, the State, on redirect examination, questioned McZeal as follows:

> Q. Now, Mr. Register asked if you knew about his [Defendant] being in the National guard.
>
> A. Yes, sir.
>
> Q. You knew he was in the National Guard?
>
> A. Yes, sir.
>
> Q. Did you know he was AWOL from the National Guard?
>
> A. He was what?
>
> Q. He was AWOL, absent without leave.

11

> A.     Not to my knowledge.
>
> Q.     Not to your knowledge, okay.  Did you know that he had be[sic]  cited for threatening a superior officer?

Defendant objected to the line of questioning, arguing that it was inappropriate "bad acts" evidence and that the State asked the question solely for the purpose of establishing Defendant's bad character for the jury.  The State argued that the question was permissible since on cross-examination defense counsel asked the witness about Defendant's service in the National Guard.

The trial court sustained the objection, stating:

> This is not the particular witness; that's the objection.  He could not know the answer to that question.  And I sustained the objection; it's to be stricken.  This is not the proper witness.  How can this witness know the answer to the question that you asked.  You asked a question just so a jury would hear the question.

Defendant then asked for a mistrial, stating that the jury had been prejudiced.  The trial court denied the motion for a mistrial, then admonished the jury to disregard the remarks.

Louisiana Code of Evidence Article 404(B) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."

Moreover, La.Code Crim.P. art. 770 provides, in pertinent part:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.

Defendant argues, in brief, that the admonishment to the jury did not sufficiently alleviate the alleged prejudice caused to his case by the questions.

Evidence of criminal offenses other than the offense being tried is generally inadmissible as substantive evidence, because of the substantial risk of prejudice to the defendant. *State v. Hills*, 99-1750 (La.5/16/00), 761 So.2d 516, 520-21. This avoids the unfair inference that a defendant committed the crime charged simply because he is a person of bad character. *Id.*

"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the . . . district attorney, or a court official, during the trial or in argument, refers directly or indirectly to . . . [a]nother crime . . . alleged to have been committed by the defendant as to which evidence is not admissible[.]" LSA-C.Cr.P. art. 770(2). *See State v. Anderson*, 02-273, p. 5 (La.App. 5 Cir. 7/30/02), 824 So.2d 517, 521, *writ denied,* 02-2519 (La.6/27/03), 847 So.2d 1254.

. . . .

A mistrial is a drastic remedy. *State v. Black,* 03-911, p. 7 (La.App. 5 Cir. 12/30/03), 864 So.2d 836, 841. It is only warranted under LSA-C.Cr.P. art. 770 when a remark or comment referencing the defendant's commission of other crimes results in prejudice to the defendant's substantial rights sufficient to undermine the fairness of the trial. *Id.*; LSA-C.Cr.P. art. 771. An exception to LSA-C.Cr.P. art. 770's rule requiring a mistrial is made if the evidence is substantially relevant to some purpose other than to show that the defendant is a bad person and, therefore, more likely to have committed the crime. *State v. Black*, 03-911 at 8, 864 So.2d at 841. The trial judge must balance the pertinent factors to determine whether the probative value of the evidence is outweighed by its prejudicial effect. *Id.* The determination of prejudice and the ruling on a mistrial is within the sound discretion of the trial court. *State v. Black*, 03-911 at 8, 864 So.2d at 841. This Court has found that LSA-C.Cr.P. art. 770 is not applicable unless the inference clearly constitutes a comment on other crimes committed or alleged to have been committed by the defendant. *State v. Sprinkle*, 01-137, p. 21 (La.App. 5 Cir. 10/17/01), 801 So.2d 1131, 1144, *writ denied,* 01-3062 (La.10/25/02), 827 So.2d 1174, and *cert. denied,* 537 U.S. 1235, 123 S.Ct. 1358, 155 L.Ed.2d 200 (2003).

. . . .

The introduction of inadmissible other crimes evidence is subject to a harmless error analysis. *State v. LaGarde,* 07-288, p. 9 (La.App. 5 Cir. 10/30/07), 970 So.2d 1111, 1123. "An error is harmless when the

> verdict is 'surely unattributable to the error.'" *Id.* On appeal, an improper reference to other crimes evidence is subject to the harmless error rule, i.e., whether the verdict actually rendered in the case was surely unattributable to the error. *State v. Nelson*, 02-65, p. 11 (La.App. 5 Cir. 6/26/02), 822 So.2d 796, 804, *writ denied,* 02-2090 (La.2/21/03), 837 So.2d 627.

*State v. Jones,* 08-20, pp. 11-14 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 243-44.

Even assuming that the questions inferring bad acts were improper, we find no reason to overturn the guilty verdict. Defendant was charged with second degree murder. As discussed above, the evidence was sufficient for the trier of fact to have concluded that Defendant was guilty of the offense of intentionally seeking to kill or inflict great bodily harm on the victim. However, the jury chose to convict Defendant of the compromise verdict of manslaughter, a lesser included offense. It cannot be said that the questions of whether the witness knew if Defendant had been AWOL from the National Guard or that he was cited for insubordination substantially affected the outcome of the trial. The witness, who purportedly was a good friend of Defendant, answered, "not to my knowledge." The error, if any, was harmless. Therefore, there is no merit to this assignment of error.

*Mistrial*

Defendant again argues the trial court erred when it denied his motion for a mistrial based on the fact the State did not turn over until the day trial commenced taped interviews of certain witnesses (Lawrence, Mitchell, and Isadore) who testified at trial. These three witnesses were with or relatively close to the victim when he was shot.

Defense counsel moved for a mistrial, stating as follows:

> Basically, when we started this case, we had an open file discovery in this particular case. And Mr. Magee was kind enough to give me all the discovery in the case.

It was brought to my attention, I believe, on Saturday that he had interviewed some key witnesses in this case. Perhaps, starting Thursday afternoon and running through Saturday afternoon. He was kind enough to record the statements[,] and he gave me the recorded statements on yesterday morning. I listened to the statements of at least three (3) of these witnesses on last night.

And what these witnesses are basically saying is that they are IDing my client on the crime scene and basically indicating that they definitely saw him pull the trigger. They saw him running around and what have you. And I'm concerned by those particular statements because I did not get the opportunity to talk to my client about it.

And also, I'm particularly concerned about the fact that during at least three (3) of these statements that Mr. Magee was present. And I want to make it perfectly clear. I'm not accusing him of prosecutorial misconduct, but what I'm basically saying, Your Honor, is that he was present, along with the detective, the lead detective in this case, Detective Estorge. And basically, you had these witnesses indicated damagine[sic] information against my client. And the mere fact that Mr. Magee was there, although he didn't promise them anything–but the fact that he was there would leave one to believe that they would say something available to themselves.

. . . .

Finally, I'm concerned about the lead detective in the case. When she was on the witness stand–of course, the Court has the privilege of looking at the tape or at least, listening to the tape. I believe that I asked her whether or not there was anybody else, any other witnesses that she may interview that knew about my client actually doing any type of shooting or had actually observed my client doing any act of shooting, and she indicated no.

But when I listened to these tapes, she was present when at least two (2) of these witnesses indicated that they supposedly saw my client shoot the victim.

Despite defense counsel's assertions, however, the lead detective, Judith Estorge, did testify that she interviewed all three of the witnesses either on the night of the shooting or the day after and in the week prior to trial. She testified that Mitchell refused to give a statement at the time of the shooting, and then thereafter, all three were incarcerated on unrelated charges. The State explained that both

Lawrence and Mitchell were incarcerated under different names and were not discovered until the week before trial. The State noted that even though the statements did not include exculpatory information, it turned over the tapes to defense counsel in the spirit of its open discovery policy. The State agreed that the tapes were not given to defense counsel until the morning of trial because he had temporarily lost them. Moreover, as pointed out in the State's brief, defense counsel was aware of the fact that the three witnesses were located and would be interviewed for the purpose of testifying several days prior to commencement of the trial. The trial court denied Defendant's motion for mistrial, but ordered a recess to give defense counsel an opportunity to play the tapes for Defendant.

In brief, Defendant cites La.Code Crim.P. art. 775, which provides, in pertinent part, that "[a] mistrial may be ordered, and in a jury case, the jury dismissed, when: . . . (3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law."

> La.Code Crim. P. art. 775 provides that a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. However, mistrial is a drastic remedy which should be granted only when the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. *State v. Selvage,* 93-1435, pp. 5-6 (La.App. 1st Cir. 10/7/94); 644 So.2d 745, 750, *writ denied,* 94-2744 (La.3/10/95); 650 So.2d 1174. Determination of whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed on appeal without abuse of that discretion. *State v. Lynch,* 94-0543, p. 10 (La.App. 1st Cir. 5/5/95); 655 So.2d 470, 477, *writ denied,* 95-1441 (La.11/13/95); 662 So.2d 466.

*State v. Berry,* 95-1610, p. 7 (La.App. 1 Cir. 11/8/96), 684 So.2d 439, 449, *writ denied,* 97-278 (La. 10/10/97), 703 So.2d 603.

Defendant argues in brief that he was denied his right of confrontation and his right to cross-examine the witnesses against him. However, this assertion is inapplicable to the situation since Defendant cross-examined the witnesses at length and had the opportunity to review the tapes prior to their direct examination. In *Berry*, the defendant moved for a mistrial because the State had failed to timely provide him with a statement made by a witness to the police. After the witness testified, the trial court allowed the defendant an opportunity to review the prior statement for the purpose of cross-examination and potential impeachment. The first circuit did not agree with the defendant:

> At the conclusion of this witness' testimony, the defense moved for a mistrial. The trial court denied the motion, noting that the defense had been provided with the statement and had used it on cross-examination to impeach the witness' testimony to "great advantage." As the trial court correctly ruled, mistrial would be an inappropriate sanction against the State in this instance where there was no showing that the defendant's substantial rights had been prejudiced. The trial court did not abuse its discretion in denying this motion.

*Id.* at 451.

Defendant further argues that it was inappropriate that the district attorney who prosecuted the case was present during the interview with the witnesses for the reason that "[t]his created an obvious dilemma for the defense. How could he fully confront the witnesses against his client, when one of the persons directly involved [with] the witnesses' statements was the assistant district attorney[?]" However, we find nothing which prohibits the prosecuting attorney from being present during an interview with his own witnesses.

We find that there is no merit to this assignment of error. Defendant has failed to establish that he was subjected to substantial prejudice because of the late receipt of the tapes. Defense counsel was made aware of the witnesses and their locations

17

midweek prior to trial. He was given the tapes the morning of *voir dire* and listened to the tapes that night. He was allowed time the following day to review the witnesses' statements with Defendant prior to direct examination and cross-examined the witnesses at length. Accordingly, there was no abuse of discretion when the trial court denied Defendant's motion for a mistrial.

*Excessive Sentence Claim*

Defendant contends that his sentence of thirty years is excessive under the circumstances of the case. He argues that the trial court erred when it enhanced his sentence. He further argues that the trial court failed to give a factual basis for the near maximum sentence.

Defendant was found guilty of manslaughter, which is punishable with up to forty years imprisonment. La.R.S. 14:31.

> The standard of review for Louisiana appellate courts in determining whether a sentence levied upon a particular defendant was excessive is the manifest-abuse-of-discretion standard. *State v. Guzman*, 99-1753 (La.5/16/00), 769 So.2d 1158. A trial judge has considerable latitude in imposing sentences within the constraints provided by law. *State v. Thompson,* 02-0333 (La.4/9/03), 842 So.2d 330. However, in *State v. Marshall,* 94-0461, p. 24 (La.9/5/95), 660 So.2d 819, 829, the Louisiana Supreme Court held that "[a] sentence may violate a defendant's constitutional right against excessive punishment even if it is within the statutory limit," citing *State v. Sepulvado,* 367 So.2d 762 (La.1979). Furthermore, under both United States and Louisiana law, a sentence is unconstitutionally excessive if it "(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977); *State v. Handy*, 96-2505, p. 1 (La.1/6/97), 686 So.2d 36, 37, citing *State v. Dorthey,* 623 So.2d 1276 (La.1993). The Louisiana Supreme Court has provided a list of several factors that appellate courts are to consider in ascertaining whether a sentence, by its excessive duration or severity, is grossly disproportionate to the underlying offense. *State v. Baxley*, 94-2982 (La.5/22/95), 656 So.2d 973, citing *State v. Telsee,* 425 So.2d 1251, 1253 (La.1983). The appellate court's analysis of the sentence is cumulative and centers on an amalgam of

18

relevant factors. *Id.* Among these factors the supreme court notes, [sic] are "the nature of the offense and the offender, a comparison of the punishment with sentences imposed for similar crimes, the legislative purpose behind the punishment, and a comparison of the punishment provided for this crime in other jurisdictions. *Baxley,* 656 So.2d at 980, citing *Telsee*, 425 So.2d at 1253-54.

*State v. Wilturner*, 03-719, pp. 5-6 (La.App. 3 Cir. 11/5/03), 858 So.2d 743, 746.

At the sentencing hearing, Defendant's father, Frederick James Simon, and his aunt, Patricia Simon, testified. Frederick Simon told the trial court that his son was always a good student in school, until he dropped out, and that he was in the National Guard and was, at the time of the shooting, going to school to be a welder. He said that Defendant always tried to help people when he could. Defendant's aunt told the trial court how, as Defendant got older, he prepared himself to take the GED and passed with flying colors. The victim's father and brother also addressed the trial court, describing the pain of their loss.

The trial court noted for the record that he had received many letters regarding Defendant and asking for leniency. The trial court considered the seriousness of the offense and that a weapon was used to commit the crime. The trial court noted that a lesser sentence would deprecate the crime and that there was a need for correctional treatment. It also considered that Defendant had another felony conviction. The trial court further stated:

> The offense occurred before the charge, but the conviction was before the conviction on this charge. That was for possession of cocaine.

> Also, the Court is also considering that this is a responsive verdict in that there–I think there was sufficient evidence to convict you of murder in this case.

> I think it's obvious that the Jury rejected your claim of self-defense. But I think there is some indication that it could be a compromise verdict.

19

I also advise you that you're not eligible for good time in this case under Title 15:371.3.

So, the only mitigating circumstances would be your potential for doing good in this matter and your age. Nevertheless, the aggravating circumstances are such that the Court will determine your sentence based upon the offense and the aggravating circumstances.

In brief, Defendant contends that the trial court committed constitutional error. He argues that "[i]t is clear that the trial court gave a higher sentence–although the jury found the evidence sufficient only for a manslaughter conviction–because it felt the evidence supported a murder conviction. The trial court clearly found that as an aggravating factor." The Defendant further states: "A trial judge cannot enhance a defendant's sentence by going beyond the facts determined by a jury."

We find no merit in this argument. As noted above, one of the factors an appellate court may consider when determining whether a sentence is excessive is the nature of the offense. As discussed in Defendant's assignment of error regarding sufficiency of evidence, the facts of the case, as presented to the jury, supported a charge on the offense of second degree murder. Manslaughter is murder committed in the "sudden passion" or "heat of blood," which are only mitigating factors and were not present in this case. The jury had the prerogative of finding Defendant guilty on the responsive verdict even though the facts of the case indicated an intentional offense rather than one committed in sudden passion or heat of blood.

Similar sentences have been upheld by this court where defendants were convicted of manslaughter under circumstances similar to those in this case. *See State v. Griffin,* 06-543 (La.App. 3 Cir. 9/27/06), 940 So.2d 845, *writ denied*, 07-02 (La. 9/14/07), 963 So.2d 995; *State v. Carrier,* 95-1003 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431; *State v. Ford,* 94-1440

20

(La.App. 3 Cir. 4/5/95), 653 So.2d 107; *State v. Darby*, 502 So.2d 274 (La.App. 3 Cir.1987), *State v. Roussel,* 424 So.2d 226 (La.1982); and *State v. Heath*, 447 So.2d 570 (La.App. 1 Cir.1984), *writ denied*, 448 So.2d 1302 (La.1984).

Finally, while Defendant argues that the trial court did not state a sufficient basis for the sentence, we find that the record before us is sufficient to find that the trial court did not abuse its vast discretion when it sentenced Defendant to three-fourths of the potential sentence. Defendant could have received life imprisonment.

> The articulation of the factual basis for the sentence is the goal of La. C. Cr. P. art. 894.1, not a rigid or mechanical compliance with its provisions. Where the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. *State v. Hampton,* 38,017 (La.App. 2d Cir.1/28/04), 865 So.2d 284, *writs denied,* 2004-0834 (La.3/11/05), 896 So.2d 57 and 2004-2380 (La.6/3/05), 903 So.2d 452.

*State v. Martin,* 40,150, pp. 3-4 (La.App. 2 Cir. 9/21/05), 911 So.2d 917, 920.

Thus, we find no merit to this assignments of error.

## *Suppression of Evidence*

Defendant argues that the trial court erred with it denied his motion to suppress evidence. Defendant contended that he had invoked his right to counsel, but the police continued to interrogate him until they elicited a confession. Accordingly, these statements should be suppressed as illegally obtained evidence. A hearing was held on Defendant's motion on the morning of the first day of trial. Defendant claimed that the interviewing officer, Detective Judith Estorge, misled him as to who she was and that he never would have made a taped statement without an attorney present otherwise.

21

In *State v. Poullard*, 03-940, p. 6 (La.App. 3 Cir. 12/31/03), 863 So.2d 702, 709-10, *writ denied,* 04-908 (La. 3/18/05), 896 So.2d 995, this court discussed whether a defendant's right to counsel was effectively invoked, as follows:

> A defendant's right to counsel is guaranteed in LSA Const. art. I, § 13. When counsel is requested, interrogation must cease; officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney. *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S.Ct. 486, 491, 112 L.Ed.2d 489 (1990). If before or during interrogation an accused asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation even if he has been advised of his rights. Such an accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona,* 451 U.S. 477, 485, 101 S.Ct. 1880, 1884-1885, 68 L.Ed.2d 378 (1981).

*State v. Williams*, 01-1650, p. 7 (La.11/1/02), 831 So.2d 835, 842-43.

> The Supreme Court stated the invocation of [the right to counsel] ". . . requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney **in dealing with custodial interrogation by the police**." *McNeil* [*v. Wisconsin* ], 501 U.S. [171] at 178, 111 S.Ct. [2204] at 2209, 115 L.Ed.2d 158 (emphasis in original).
>
> The applicability of the " 'rigid' prophylactic rule" of Edwards requires courts to "determine whether the accused **actually invoked** his right to counsel." *Davis v. United States*, 512 U.S. [452] at 458, 114 S.Ct. [2350] at 2355[, 129 L.Ed.2d 362 (1994)] (emphasis in original) (citations omitted). To avoid difficulties of proof and to provide guidance to officers conducting interrogations, this is an objective inquiry. *Davis*, 512 U.S. at 458-459, 114 S.Ct. at 2355. Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis*, 512 U.S. at 459, 114 S.Ct. at 2355 (citation omitted). If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable police officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right to counsel, the cessation of questioning is not required. *Id.* (emphasis in original). The suspect must articulate his desire to have counsel present with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.*

*State v. Payne,* 01-3196, pp. 9-10 (La.12/4/02), 833 So.2d 927, 935.

Moreover, regarding whether a suspect invokes the right to counsel:

In analyzing whether there has been a direct, clear, unequivocal, and unambiguous request for counsel, courts must give a broad, rather than narrow, interpretation to the suspect's request. *State v. Payne,* 833 So.2d at 936, citing *Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The admissibility of a confession or statement is a determination for the trial court and the trial court's ruling will not be overturned unless the preponderance of the evidence clearly favors suppression. *State v. Gant,* 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1123.

*State v. Allen,* 06-778, p. 6 (La.App. 5 Cir. 4/24/07), 955 So.2d 742, 748, *writ denied,* 08-2432 (La. 1/30/09), 999 So.2d 754.

At the suppression hearing, Detective Estorge testified that Defendant was brought into the police department in the early morning. She stated that he was *Mirandized* and that he stated that he understood his rights. She testified that the usual procedure was to interview a suspect first then, if he was willing to speak, to initiate a taped interview. She stated that when she was discussing whether he would be willing to do a taped interview with Defendant, he said, "I mean, I got to get a lawyer appointed to me or something?" She said that she told him that it was up to him whether he wanted to speak with a lawyer first, and after she again advised him of his rights, she asked him if he was willing to speak with her. He responded "Well, I'm willing to tell you what I just told you."

23

The conversation between Defendant and the detective, recorded and transcribed, went as follows:

JE: And before we began this interview I read you this advise of right form?

MS: Yes Ma'am.

JE: and you signed here, that's your signature?

MS: Yes Ma'am.

JE: And you understand those right[s]?

MS: Yes Ma'am.

JE: And you're willing to talk to me?

MS: Well did I?

JE: I'm asking you. Are you still willing to talk to me?

MS: I mean will it do me any good?

JE: Well I'm giving you the opportunity so we can put it on tape for your side of the story. Are you willing to do that?

MS: Well (inaudible)...I mean I gotta get a lawyer appointed to me or something?

JE: That's up to you. If you wanna talk to me today that's what we're here for now.

MS: What are you?

JE: I'm a police officer.

MS: So you're not, what do you . . .

JE: The badge, when I walked in here and I told you what I was charging you with.

MS: Right. So. . .

JE: And that's why I read you your rights form. I told you I was Detective Estorge, Lafayette Police Department.

24

MS: Right.

JE: Correct?

MS: Yes I understand all that.

JE: All right. We went through what happened, but now I'm trying to put it on tape.

MS: Right.

JE: Right. You remember all that?

MS: Yes Ma'am.

JE: All right. Are you willing to talk to me?

MS: Well, I'm willing to tell you what I just told you.

JE: Okay, well that's what I'm asking you.

MS: Yes Ma'am.

JE: All right. And you know it's being taped?

MS: Yes Ma'am.

Defendant's one question, "Well (inaudible). . .I mean I gotta get a lawyer appointed to me or something?" does not rise to the standard of being a direct, clear, unequivocal, and unambiguous request for counsel. After the detective told him that having counsel was up to him, he never broached the subject again.

In *State v. Chesson,* 03-606, p. 11 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 175, *writ denied,* 03-2913 (La. 2/13/04), 867 So.2d 686, this court found that the defendant's "statement regarding his 'thinking' that he possibly 'should' speak with an attorney is not the type of unequivocal and unambiguous statement described above. *See Davis* [*v. United States*], 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (wherein the United States Supreme Court found the statement 'Maybe I should talk to a lawyer' not to be an unequivocal invocation of the right to counsel)."

In *Allen,* 955 So.2d 742, the fifth circuit noted that the defendant stated twice that he was thinking he might want an attorney. However, the fifth circuit found no error with the trial court when it denied his motion to suppress because the statements were not an unequivocal expression of a desire for an attorney. The fifth circuit said that unless the statement was clearly unequivocal, cessation of questioning was not required.

Finally, in *State v. Leger*, 05-011, pp. 31-32 (La. 7/10/06), 936 So.2d 108, 135, *cert. denied,* 549 U.S. 1221, 127 S.Ct. 1279 (2007), the supreme court did not find that the statement, "I know I need to see on [a lawyer]" amounted "to an unambiguous request for counsel that would indicate to a reasonable police officer that the defendant was asking for counsel at that time."

Therefore, we find that Defendant's statement was not a clear, direct, and unequivocal invocation of his right to counsel. The trial court did not err when it denied Defendant's motion to suppress.

*Circumstantial Evidence*

Defendant argues in brief that "[t]he court admitted circumstantial evidence that did not exclude every hypothesis of innocence." The evidence Defendant is referring to was a spent bullet found in a mailbox a few days following the shooting, pictures of the mailbox, and a cartridge found in McZeal's car. At trial, Christopher Henderson, a chemist with the Acadiana Crime Laboratory, testified that the spent bullet found in the mailbox and the cartridge found in McZeal's car were of the same caliber. Although it had been established that McZeal's gun used the same caliber cartridges as the cartridge found in his car and the spent bullet found in the mailbox,

26

the witness could not say that the bullet in the mailbox was fired out of the same gun used to shoot the victim since the gun was never recovered.

Louisiana Revised Statutes 15:438, regarding circumstantial evidence provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Defendant misconstrues the circumstantial evidence rule. It is correct that the totality of such evidence must exclude every reasonable hypothesis of innocence when circumstantial evidence forms the basis of the conviction; however, circumstantial evidence is still very much the "reasonable doubt" standard set forth by *Jackson*. The circumstantial evidence rule is an evidentiary guideline for the jury. *See State v. Collins*, 01-1459 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, *writ denied,* 02-2490 (La. 6/27/03), 847 So.2d 1254.

Defendant's conviction was based on eyewitness accounts and his own confession. Defendant testified that he used McZeal's gun to shoot the victim, and as noted, the evidence was more than sufficient without the evidence regarding the bullet in the mailbox and the cartridge. The admission of the spent bullet and cartridge did not contribute to the verdict of manslaughter. Moreover, Defendant does not reveal what reasonable hypothesis of innocence the State failed to exclude nor does he establish in what way the admission of the evidence was prejudicial. Thus, there is no merit to this assignment of error.

## DECREE

For all of the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

27

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal, Rule 2-16.3.